Filed 10/1/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| C.F.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>MENDOCINO COUNTY,<br><br>    Respondent;<br><br>MENDOCINO COUNTY HEALTH AND<br>HUMAN SERVICES AGENCY,<br><br>    Real Party in Interest. | A142192<br><br>(Mendocino County<br>Super. Ct. Nos. SCUKJVSQ 13-<br>16775,  SCUKJVSQ 13-16776,<br>SCUKJVSQ 13-16777) |

C.F. (Mother), the mother of J.L., R.L., and A.L. (collectively Minors or the children) petitions for extraordinary relief under California Rules of Court, rule 8.452, asking us to set aside the juvenile court's order setting a permanent plan hearing pursuant to Welfare and Institutions Code[1] section 366.26.  We shall deny the petition on the merits.

## I.  BACKGROUND

### A.  Petition and Detention

In May 2013, the Mendocino County Health and Human Services Agency[2] (the Agency) filed a petition pursuant to section 300 on behalf of Minors.  As later sustained,

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] The petition named the Mendocino County Department of Social Services as real party in interest.  In its opposition brief, the real party in interest explained that its current

1

the petition alleged failure to protect (§ 300, subd. (b)) in that Mother had a substance abuse problem that inhibited her ability to parent her children and that Mother and the children's father, E.L. (Father)[3] were not providing their children with adequate food or shelter. Minors were detained. At the time, they were eight, seven, and three years old.

According to the detention report, sheriff's deputies conducting an ongoing investigation went to a home occupied by two men (neither of whom was Father), and found the two younger children, R.L. and A.L., in their care. The home was found to be in an unsafe condition; the deputies saw glass pipes with residue used for smoking methamphetamine, used syringes, pipes and bongs used for smoking marijuana, bags of marijuana, and a large knife on the floor next to the mattress where the children were sleeping. A used methamphetamine pipe and two used syringes were in a pouch a few feet from the children. The kitchen contained no refrigerator. Dirty dishes and pots piled in the sink appeared to have been there for a few days. Food, some of it spoiled, had been left out on the counters, and trash was littered on the floor. In the bathroom was a large pile of used toilet paper, with urine in a toilet that would not flush. There was no running water, and there were dead mice under the bathtub and small boys' dirty underwear on the floor. On the outside of the house, an open power panel contained high-voltage conductors, and "jumper" wires that had been installed posed a significant fire danger. The two children said they had been wearing the same clothes since Mother had dropped them off four nights previously.

While the deputies and a social worker were at the house, Mother drove up in a car with her older son, J.L., and said the children were there on only a temporary basis. She appeared to be "extremely high and could not stand still." Her pupils were dilated, her carotid artery was pulsating quickly, and she was making uncontrolled body movements. Her pulse was between 140 and 144 beats per minute. A social worker asked Mother to

name is the Mendocino County Health and Human Services Agency. We shall use real party in interest's current name.

[3] Father is not a party to this petition. He did not visit Minors during the relevant time period, and did not respond to the Agency's efforts to contact him.

come speak with her; Mother "struggled at this request and was visibly swaying back and forth where she stood as if she were walking on a ship at sea." She was sweating profusely and had a hard time focusing on the conversation. She provided a urine sample, saying it would be "dirty." The sheriff's deputy reported that he had known Mother for several years and had seen her under the influence of a controlled substance in the past.

The detention report noted that Minors were members of or eligible for membership in an Indian tribe, and that the social worker had spoken with the tribe's Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) office and given notice of the detention hearing. The tribe later confirmed that Minors were registered members.

## B. Jurisdiction

A report was prepared for the June 2013 jurisdiction hearing. According to the report, immediately after Minors were detained, Mother was referred to the Pinoleville Vocational Rehabilitation program to assist her in getting into Friendship House, a Native American inpatient facility.

The juvenile court found true the allegations pursuant to section 300, subdivision (b), that Mother had a substance abuse problem that inhibited her ability to parent her children and that Mother and Father were not providing Minors with adequate food or shelter.

## C. Disposition

### 1. Disposition Report

The report for the July 10, 2013 disposition hearing noted the following facts. In June 2013, after the children were detained, Mother was arrested for sale and possession of methamphetamine and being under the influence of a controlled substance. She also faced a felony charge for vehicle theft. Mother told a social worker she had started using methamphetamine in 2006 or 2007.

At the time of her arrest, Mother had been working with Pinoleville Vocational Rehabilitation to try to get into Friendship House for treatment. In order to be accepted into the facility, she needed to have a telephone interview and get a physical examination.

3

Because of her arrest, she did not have the telephone interview, and she did not continue working with the program.

The director of Mother's tribe's Community/Family Services Program had told the social worker the tribe would not pay for Mother to go into Friendship House because she was not registered with them for services. The director also indicated Mother would have to apply for funding through a state program such as Medi-Cal—and be turned down by them—before she could apply through her tribe's health authority, and that Mother would have to resolve her outstanding criminal cases before entering Friendship House.

The social worker had spoken with Mother many times about her need to be in inpatient drug rehabilitation. Mother's tribe had recommended a psychological or mental health examination, but it was the Agency's position that Mother should participate in several months of inpatient rehabilitation and then be re-assessed concerning her need for a psychological evaluation.

Mother had received drug services through the Yuki Trails Counseling Center (Yuki Trails) in the past. At the time of the disposition report, Mother was not attending outpatient services at Yuki Trails, but was in contact with the program by phone.

*2. Dispositional Hearing*

At the August 1, 2013 dispositional hearing, the juvenile court found ICWA applied to the case, that reasonable efforts had been made to eliminate the need for removal of the children, that Mother and Father had made no progress toward alleviating or mitigating the causes requiring placement, and that the children's physical or emotional well-being would be endangered if they returned to their home. The court also found by clear and convincing evidence that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. The court declared Minors dependent children, placed them in the care of the Agency, and ordered reunification services.

At the hearing, the parties discussed Mother's case plan. The Agency had submitted a proposed plan that included, as one of its objectives, "The parents will either find legal employment in order to support their family or will be enrolled in a program

4

for job training." Mother's counsel took the position that the requirement went beyond the proper scope of a juvenile case. The parties agreed to change that language to require Mother to "find a gainful endeavor to occupy her extra time that may include school, job training or work." The proposed case plan also included the objective that Mother stay sober and show her ability to live free from alcohol dependency. To accomplish that goal, the proposed plan required Mother to participate in and complete a substance abuse assessment, follow treatment recommendations, and attend an inpatient program. Mother's counsel noted that the Agency might not be able to provide an inpatient program and, at his request, the juvenile court struck the provision mandating that Mother attend inpatient treatment.

## D. Substance Abuse Reviews

A 30-day substance abuse review took place on August 29, 2013, in Mother's absence. Counsel for the Agency told the juvenile court Mother had not been in contact with Yuki Trails for two weeks and was not in compliance with her case plan. Mother's counsel said Mother had tried to get into residential treatment but had not been able to do so because of funding problems.

A 60-day substance abuse review was held on September 26, 2013. Mother was not present. Her counsel again told the juvenile court Mother had had difficulty getting into a residential program because she received money from her tribe.[4] Counsel for Minors indicated Mother had access to a program and a counselor at Yuki Trails, but that her participation had been "spotty."

## E. Six-Month Review

### 1. Status Review Report

The six-month review hearing took place on February 4, 2014. The Agency's status review report stated that the social worker had tried without success to make contact with the parents. The social worker had consulted with Mother's substance abuse

---

[4] It appears that the money Mother received from her tribe put her over the income limit for being accepted into the program without having to pay for it herself.

5

treatment providers, had met at least monthly with Minors and their foster parents, and had consulted with Mother's tribe to ensure compliance with ICWA.[5]

According to the report, neither Mother nor Father was in compliance with the case plan. The Agency had sent a letter to Mother in late August 2013 telling her that her visits with Minors were suspended because she had missed two consecutive visits. The letter told Mother she should contact the social worker in order to re-establish a visitation schedule. As of January 30, 2014, Mother's visits were still suspended.

On October 17, 2013, the social worker had written to Mother telling her she was out of compliance with her case plan. According to the letter, the social worker had spoken with Yuki Trails and was told that Mother had attended only two groups in the month of September and had refused to take a drug test. The social worker also pointed out that in mid-September, he had spoken with Mother on the telephone and made an appointment to meet with her so she could review and sign her case plan; however, Mother missed the appointment, and left a message telling the social worker she could not attend due to the birth of her sister's baby. She later left a message asking the social worker to call her, but did not leave a return telephone number. Additionally, the social worker stated that Friendship House had told him there was an opening there and that they had contacted Yuki Trails to let Mother know a space was available. The social worker asked Mother to contact him immediately to schedule a meeting to discuss her case plan and what she needed to do to reunify with the children.

In early December 2013, Mother left a telephone message for the social worker telling him she had checked herself into Friendship House, but that she could not remain there because she was above the income level to qualify for acceptance. She asked to have her youngest child, A.L., returned to her care, because Friendship House would allow her to remain in treatment if she had a child with her. The social worker discussed the matter with his supervisor and senior manager, and they agreed that placing A.L. in Mother's care would place the child at risk of harm because of Mother's lack of

---

[5] With the approval of the tribe, Minors had been placed in the home of a relative.

engagement in services, her lack of any documented period of sobriety, and her unknown whereabouts for the previous months. The social worker spoke with Friendship House staff, who confirmed that Mother would have to leave the next day if her child was not able to be with her. The staff also told him they were researching possible treatment alternatives for Mother closer to Mendocino County.

Mother left a message for the social worker a few days later telling him she was no longer at Friendship House and that she wished to speak with him. He called her the same day at the number she left, but there was no answer and he could not leave a voice message. He called her again eight days later, and she agreed to meet with him on December 23, 2013. She failed to show up for that appointment. The social worker called Mother again on December 26, 2013, but there was no answer and he could not leave a message.

Mother met with the social worker on January 7, 2014. She said she wanted to reengage in services and was prepared to enter residential treatment. She told him she had been to Yuki Trails and had arranged to attend weekly group and individual counseling sessions; the social worker confirmed this information with Yuki Trails. Mother completed a urinalysis test, with clean results for all substances. She agreed to and signed her case plan.

The social worker arranged for Mother to resume visitation with Minors the following week. He also contacted the ICWA worker for Mother's tribe, who told him Mother knew what she needed to do in order to enter residential treatment and that she had been in contact with the tribe and had asked for support in entering a residential treatment program.

The updated case plan noted, in connection with the objective that Mother find a gainful endeavor to occupy her extra time, that she had recently reengaged in court-ordered services, was awaiting residential substance abuse treatment, and was working with the social worker to find a gainful endeavor.

The Agency recommended that Mother receive additional reunification services.

7

## 2. *Hearing*

At the six-month review hearing, Mother's counsel noted that it was difficult for Mother to get from her home in Covelo to Willits, where some of the services took place, and the court asked if the Agency could arrange to have two events Mother had to attend take place on the same day. Counsel for the Agency said the Agency would try to do so. The court asked Mother if she was satisfied with the services to which she had been referred, and Mother said she liked going to Yuki Trails, that she had been going to Narcotics Anonymous and was going to begin a 12-step program, and that she had been trying to arrange for a residential program.

The juvenile court ordered continued reunification services for Mother. At the end of the hearing, the court admonished Mother that she needed to work hard on her plan, and that if she did not engage in services, the court could terminate them at the 12-month hearing.

## F. 12-Month Review

### 1. *Status Review Report*

In advance of the May 29, 2014, 12-month review, the Agency prepared a status report. Mother's visitation with the children had been sporadic. After completing a visit in early February, she cancelled or failed to appear for five consecutive visits. The Agency sent Mother a letter on March 11 telling her visits were suspended until she contacted the social worker. Mother contacted the Agency on March 31 asking for visitation. She met with the Agency on April 2, and once again agreed to her case plan and signed it. She visited with the children twice in April, then cancelled a visit in late April and one in early May.

The social worker had consulted with Mother's tribe, Yuki Trails, the Turtle Lodge residential treatment center in Fresno, and the ICWA worker. The Agency made arrangements for a social worker assistant to help with transportation and to provide gas vouchers. Mother was approved to start a "Family Empowerment Group," but failed to attend. The Agency also referred her to a series of support group meetings. She arrived for a support group session on April 22, but did not sign in and left early.

8

Mother was enrolled in the Yuki Trails treatment program, but her attendance had been poor. Her substance abuse counselor recommended Mother attend the outpatient program three or four times a week, but she had attended only seven sessions in January, three in February, four in March, and three in April. She had also participated in one individual session in April. Because of Mother's poor attendance, the counselor characterized her involvement in the program more as "case-management, than [as] out-patient treatment."

Mother had been placed on a waiting list for the Turtle Lodge residential treatment center, which needed her to provide updated paperwork. A representative of a tribal treatment center also reported needing updated paperwork from Mother, and reported that Mother was inconsistent in maintaining contact with the treatment center and her tribe.

2. *Hearing*

At the 12-month review hearing, Mother testified that she was attending substance abuse sessions at both Yuki Trails and another program. She had applied for and been accepted into the Turtle Lodge residential program, and the tribe was going to pay for it. According to Mother, the Agency's assistance in arranging the inpatient placement had been limited to making one phone call.

Part of Mother's case plan was to look for appropriate housing. Mother testified that the social worker had given her "a little bit of help," and Mother had filled out "Section 8" applications and tribal housing applications. However, she had not followed the social worker's instructions for finding housing, because she intended to go into inpatient treatment.

Mother testified that she had been going to a woodworking workshop and tutoring one of her younger cousins, but that she had not been doing any other activities that would help her maintain her sobriety.

The tribe's ICWA representative testified that Mother had received referrals for treatment from the tribe, including two referrals for inpatient treatment. Her participation in outpatient treatment had been sporadic. The tribe only paid for certain inpatient

9

programs, and the residential program Mother had wanted to attend, Friendship House, was not one of them.

The juvenile court found that Mother had partially complied with her case plan, that there was no substantial probability Minors would be returned to her physical custody within 18 months of their removal, that reasonable services to help the parents overcome the problems that led to the children's removal had been provided or offered, and that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. The court terminated reunification services to both parents and set a hearing pursuant to section 366.26 to determine a permanent plan for the children.

## II. DISCUSSION

### A. Standard of Review

Mother contends the juvenile court acted improperly in setting the section 366.26 hearing because the Agency did not make active efforts to prevent the breakup of the Indian family as required by ICWA and section 361.7, subdivision (a). The parties disagree on the correct standard of review for the juvenile court's finding that active efforts had been made. Mother asserts the issue raises a mixed question of fact and law, and that we should decide independently whether the services that were provided constituted active efforts; she acknowledges, however, that some courts have applied the substantial evidence test to review a finding that active efforts were made. The Agency urges us to apply substantial evidence review.

*1. Statutory Background*

Section 361.7, subdivision (a), requires "a party seeking an involuntary foster care placement of, or termination of parental rights over, an Indian child [to] provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." These efforts must "utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd.

(b).)[6] In addition (whether or not ICWA applies to a case), a court may not order a hearing pursuant to section 366.26 "unless there is clear and convincing evidence that *reasonable services* have been provided or offered to the parent or legal guardian." (366.21, subd. (g)(1), italics added.)

Under California law, there is no significant difference between "active efforts" required by ICWA and "reasonable services" required in both ICWA and non-ICWA cases under section 366.21, subdivision (g)(1). As explained in *In re Michael G.*, *supra*, 63 Cal.App.4th at p. 714, "while the court must make a separate finding under [25 U.S.C.] section 1912(d), the standards in assessing whether 'active efforts' were made to prevent the breakup of the Indian family, and whether reasonable services under state law were provided, are essentially undifferentiable." The court noted that although "California law [at the time did] not *expressly* require 'active efforts' to preserve the family," state law did require " '[t]he effort [to] be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success.' [Citation.]" (*Ibid.*, italics added.)[7]

---

[6] Section 361.7, with its "active efforts" requirement, was enacted in 2006. (Sen. Bill No. 678, Stats. 2006, ch. 838, § 50; see also *In re A.A.* (2008) 167 Cal.App.4th 1292, 1298.) It tracks language found in 25 U.S.C. § 1912, subdivision (d), part of the federal ICWA statutory scheme, which provides, "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Even before section 361.7 was enacted, California courts applied this federal rule in dependency cases involving Indian children. (See, e.g., *In re Michael G.* (1998) 63 Cal.App.4th 700, 713–717; *Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016–1018; see also *In re A.A.*, *supra*, 167 Cal.App.4th at p. 1318.)

[7] Some of our sister states have concluded that ICWA's "active efforts" requirement sets a higher standard than the "reasonable efforts" required by state statutes, and have treated California's rule as a minority position. (See, e.g., *Stephens v. State (In re J.S.)* (Okla.Civ.App. 2008) 177 P.3d 590, 593–594; *People ex rel. P.S.E.* (S.D. 2012) 816 N.W.2d 110, 117–118; *State ex rel. C.D. v. State* (Utah App. 2008) 200 P.3d 194, 205–206.) However, the court in *People ex rel. P.S.E.* reviewed the case law and noted that California's rule, as articulated in *In re Michael G.*, "resulted from California's

11

## 2. *The Correct Standard Is Substantial Evidence*

California courts have been inconsistent in the standards they apply to review a finding that active efforts had been made to provide services and programs designed to prevent the breakup of an Indian family. In both in *In re Michael G.*, *supra*, 63 Cal.App.4th at pp. 708, 715–716, and *In re A.A.*, *supra*, 167 Cal.App.4th at pp. 1298, 1311, 1319, the juvenile court made such a finding in the course of terminating parental rights, and the appellate courts reviewed the findings for substantial evidence. However, in *In re K.B.* (2009) 173 Cal.App.4th 1275, 1286, the court departed from this approach and relied on Alaska law to conclude that whether active efforts had been made was a mixed question of law and fact that should be decided independently.[8] (See *E.A. v. State Div. of Family & Youth Servs.* (Alaska 2002) 46 P.3d 986, 989; see also *A.M. v. State* (Alaska 1997) 945 P.2d 296, 304.) We believe *In re Michael G.* and *In re A.A.* apply the better approach.

As we have explained, the court in *In re Michael G.* noted that the standards for determining whether active efforts were made is "essentially undifferentiable" from that for assessing whether reasonable services under state law were provided. (*Id*. at p. 714; accord *In re A.A.*, *supra*, 167 Cal.App.4th at p. 1317; *Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 998.) It is well established that an appellate court reviews the juvenile

---

heightened view of 'reasonable efforts' rather than a definition of 'active efforts' failing to distinguish passive efforts." (*People ex rel. P.S.E.*, *supra*, 816 N.W.2d at pp. 116–117.)

[8] The court in *In re K.B.* reached this conclusion in the course of reviewing an "active efforts" finding made at a hearing to terminate parental rights. (*In re K.B.*, *supra*, 173 Cal.App.4th at pp. 1281, 1286.) Elsewhere in *In re K.B.*, however, the court relied on *In re Michael G.* to state that if it were required to review the juvenile court's finding that active efforts had been made before a disposition hearing at which the children were placed in foster care, it would apply the substantial evidence rule. (*In re K.B.*, *supra*, 173 Cal.App.4th at p. 1283, citing *In re Michael G.*, *supra*, 63 Cal.App.4th at pp. 715–716.) Having cited *In re Michael G.* in connection with the "active efforts" finding made in connection with the disposition hearing, the court did not explain why it applied a different standard of review to the finding made at the hearing to terminate parental rights. (*In re K.B.*, *supra*, 173 Cal.App.4th at p. 1286.)

court's findings on the reasonableness of reunification services for substantial evidence. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346; *In re Julie M.* (1999) 69 Cal.App.4th 41, 46; *Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625–626.)  We see no basis to depart from this rule in reviewing a finding that active efforts have been made.  Accordingly, we shall review the juvenile court's finding for substantial evidence, under which " ' "we review the record in a light most favorable to the judgment and must uphold the trial court's findings unless it can be said that no rational factfinder could reach the same conclusion." ' " (*In re Michael G.*, *supra*, 63 Cal.App.4th 700, 715–716.)

## B. Active Efforts

Neither ICWA nor section 361.7 defines active efforts.  (*In re K.B.*, *supra*, 173 Cal.App.4th at p. 1286; see also 25 U.S.C. § 1912(d).)  The court in *In re A.A.* described the "active efforts" requirement as follows:  " 'The phrase "active efforts," construed with common sense and syntax [citation], seems only to require that timely and affirmative steps be taken to accomplish the goal which Congress has set:  to avoid the breakup of Indian families wherever possible by providing services designed to remedy problems which might lead to severance of the parent-child relationship.' [Citations.] 'Under the ICWA, however, the court shall also take into account "the prevailing social and cultural conditions and way of life of the Indian child's tribe.  [Remedial services] shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers." ' [Citations.]" (*In re A.A.*, *supra*, 167 Cal.App.4th at pp. 1317–1318.)

*In re K.B.* also discussed the meaning of active efforts.  "[W]hile it is clear that ICWA requires that 'timely and affirmative steps be taken to accomplish the goal . . . [of avoiding] the breakup of Indian families whenever possible' [citation], ' "no pat formula" ' exists for distinguishing between active and passive efforts.  [Citation.] However, the following is a useful guideline:  'Passive efforts are when a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . is where the state caseworker takes the client through the steps of the

13

plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.' " (*In re K.B.*, *supra*, 173 Cal.App.4th at pp. 1286–1287.)

Applying these standards, the appellate court in *In re K.B.* upheld a finding that active efforts had been made. (*In re K.B.*, *supra*, 173 Cal.App.4th at pp. 1286–1287.) The agency there had referred the mother to a substance abuse program, counseling, a program to educate parents about sexual abuse, and a parenting class, which the mother completed. The agency had also provided her with resources to find shelter and housing, had provided monetary assistance with rent, and had provided bus passes so she could attend the programs and visit her children. (*Id*. at p. 1287.) Based on these efforts, the court concluded it was "abundantly clear that [the agency] did more than merely draw up a reunification plan and leave the mother to use her own resources to bring it to fruition. [Citation.] On the contrary, [the agency] provided the mother with the resources necessary to achieve the goals of her case plan. This constitutes 'active efforts' within the meaning of ICWA." (*Ibid*.)

Here, Mother contends the Agency failed to make active efforts in three ways. According to Mother, the Agency left her on her own to find a residential treatment program rather than actively assisting her, the Agency failed to provide meaningful assistance to help her find a "gainful endeavor" to occupy her extra time, and the Agency did not actively assist her in locating safe housing. We find none of these contentions persuasive.

The record does not show that Mother was left on her own to find substance abuse treatment. Mother's case plan required her to participate in and successfully complete a substance abuse assessment and follow all treatment recommendations. She was given access to both individual and group treatment at Yuki Trails, but her attendance was spotty at best, despite the social worker encouraging her to participate.

14

After the children were detained, Mother was referred to Pinoleville Vocational Rehabilitation to assist her in getting into the Friendship House inpatient program. In October 2013, the social worker informed Mother the program had told him that they had notified Yuki Trails there was an opening; thus, not only did the social worker encourage Mother to participate in her case plan, but it appears he was in contact with the inpatient program. When Mother was unable to remain in Friendship House, the social worker made several unsuccessful attempts to contact her before finally meeting with her in January 2014. The worker then both confirmed with Yuki Trails that Mother had arranged to take part in counseling and called the ICWA representative for Mother's tribe, who told him that Mother had been in contact with the tribe, that she had asked for support with entering a residential treatment program, and that she knew what steps to take. Later, the social worker consulted with the Turtle Lodge residential treatment center. The tribe's ICWA representative testified that the tribe had made two referrals to get Mother into inpatient treatment. Although Friendship House was not one of the programs for which the tribe would pay, it appears that Mother's tribe later agreed to pay for a residential substance abuse program in Fresno.

These facts fully support a conclusion that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. We recognize that Mother's tribe, rather than the Agency, made some of these efforts, but such collaboration is precisely what is called for. Section 361.7 provides that "[a]ctive efforts shall utilize the available resources of the Indian child's . . . tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).)

Nor do we agree with Mother's contention that the active efforts finding was unsupported because the Agency failed to assist her either in providing a safe home for her children or in finding a gainful endeavor to occupy her extra time. In connection with the housing goal, Mother's case plan listed a number of steps, including registering with a supportive housing program, making inquires about Section 8 housing, applying for housing and rental assistance from Northern Circle Indian Housing Authority or her

15

tribe's housing program, going to local rental agents, and obtaining a credit report.  The six-month review report shows that during most of the time covered by the report, Mother did not engage in any services, despite the social worker's repeated efforts to contact her.  By early January 2014, Mother seemed to be working on her case plan.  The social worker reported that he was working with Mother on obtaining adequate housing, and that he had referred her to the Ukiah Community Center for housing assistance.  Mother acknowledged at the 12-month hearing that the Agency had assisted her in trying to find housing, that she had discussed the housing programs with them, and that she had filled out Section 8 applications and tribal housing applications.

Moreover, the Agency made multiple, often unsuccessful, efforts to contact Mother, to meet with her, and to encourage her to comply with her case plan.  At the time of the six-month review, the social worker reported that Mother was engaging in treatment groups and counseling, and that he was working with her to find a gainful endeavor.

In evaluating the active efforts finding, we bear in mind that "[w]hat constitutes active efforts shall be assessed on a case-by-case basis." (§ 361.7, subd. (b).)  The problem that manifestly lay at the heart of these dependency proceedings was Mother's substance abuse, and, as we have explained, the evidence supports a finding that active efforts were made to assist her with this problem.  There is also evidence that, despite the impediments caused by Mother's continued failure to comply with her case plan, the Agency made some affirmative efforts to assist Mother in seeking housing and to work with her to find some sort of gainful endeavor.  In the circumstances, substantial evidence supports the juvenile court's finding that active efforts were made to prevent the breakup of the Indian family.[9]

---

[9] Even if we were to review this finding independently, as Mother suggests, we would uphold the juvenile court's finding that active efforts were made.

16

## III.  DISPOSITION

The petition is denied on the merits.  (§ 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.)  The request for a stay of the October 8, 2014 hearing is denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Bolanos, J.*

\* Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to Article VI, section 6 of the California Constitution.

17

Trial court:          Mendocino County

Trial judge:        Hon. Cindee F. Mayfield

Attorneys:

Jeremy Meltzer for Petitioner.

The Superior Court of Mendocino County for Respondent.

Office of County Counsel, Mendocino County Department of Social Services, for Real Party in Interest.

John Peter Passalacqua for Minors.

Jennifer Lynn Wilson-Tancreto for Father.