Filed 4/22/16  In re K.B. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DANIELLE B.,<br><br>          Defendant and Appellant. | A145824<br><br>(Mendocino County Super. Ct. Nos. SCUK JVSQ 15-17210, SCUK JVSQ 15-17211, SCUK JVSQ 15-17212, SCUK JVSQ 15-17213) |

        Danielle B. (Mother), mother of  C.B., N.B., W.B., and K.B., appeals from the juvenile court's orders declaring her four children dependents of the juvenile court, pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (c),[1] and removing them from Mother's custody, pursuant to section 361, subdivision (c)(1).  On appeal, Mother contends the juvenile court erred in finding that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of this Indian family, pursuant to the Indian Child Welfare Act (ICWA).[2]  We shall affirm the juvenile court's orders.

_____

        [1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

        [2] The children's presumed father (Father) is not a party to this appeal.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On April 30, 2015, the juvenile court granted the application of the Mendocino County Health and Human Services Agency (Agency) for an order authorizing entry into Mother's family home to conduct a child welfare investigation, pursuant to section 328, to determine whether child welfare services should be offered to the family and whether juvenile court proceedings should be commenced. In its application, the Agency reported that, between 2008 and 2013, the Agency had received 26 referrals for the family, which had been minimally investigated due to the noncooperation of Mother. Then, in September 2014, the Agency received two referrals from mandated reporters alleging general neglect of the children, including poor hygiene and substandard and unsafe living conditions. These allegations were found to be inconclusive and the Agency had "worked creatively" with Mother on a voluntary basis "to put rudimentary interventions, supports and services in place." Beginning on March 24, 2015, however, the Agency had received three more referrals alleging general neglect of the children; poor hygiene and at-risk behaviors of then 12-year-old C.B.; and worsened living conditions for the family, which lived outside of the city grid, reportedly on tribal family land. On April 29, 2015, the social worker and two supervisors went to the residence and saw that the amount of refuse in the yard appeared to have tripled since the social worker's last visit in December 2014. There was also a pungent odor of urine, feces, and refuse. The children and Mother were wearing filthy clothing and the children had layers of embedded dirt on them. During the visit, Mother was uncooperative, defensive, and hostile. She refused to allow the social worker to enter the family's trailer home.

On May 6, 2015, the Agency filed an original petition alleging, pursuant to section 300, subdivision (b), that the parents had been unable to recognize and provide for the children's most basic needs, and that Mother was unable to put the best interests of the children first, due to her anger and mental health issues. The petition noted that the social worker and her supervisor had gone to the residence with law enforcement on April 30, 2015, where they observed the children to be filthy and covered with dirt. During the April 30 visit to the property, Mother had "continuously berated her children in a harsh

2

and controlling manner to follow her directions as she exhibited hostile, confrontational, defiant, and angry behaviors in their presence." The petition contained allegations that Father had a history of drug dealing and methamphetamine use, as well as daily use of marijuana, which impaired his ability to adequately care for and supervise the children.

The petition further alleged that the parents had been unwilling and unable to maintain a safe, sanitary living environment for the children. During the April 30 visit, there had been an overwhelming stench and the social worker had seen piles of household refuse, including rotting food, dirty diapers, and other garbage strewn throughout the residence, an 18-foot travel trailer in which the family was living,. The trailer appeared uninhabitable due to filth, wear and tear, and an unsanitary interior. The stove did not appear to work and there was no running water in the trailer. There were two beds for six people. Some of the children slept on the floor, on a pile of dirty clothes and blankets. There was also a shoe box sized container filled with marijuana in a cupboard in the living area of the trailer. Garbage was also strewn around the property and there was a five by four foot pile of smoldering household refuse burning within around 10 feet of the trailer. The petition stated that "the condition of the trailer and the property did not meet minimum community (tribal) standards of cleanliness."

The petition also alleged, under subdivision (c) of section 300, that "[t]he ongoing controlling and manipulative behaviors of the mother around her children, together with the absence of healthy parenting by either parent," placed the children at risk of physical and emotional harm. During much of the three-and-one-half-hour visit on April 30, 2015, Mother continuously berated her children and kept her three youngest children locked inside her van with her, with only the driver side window open approximately six inches. The outside temperature was hot and the three children could be heard screaming and crying. Seven-year-old N.B. later said he was upset because Mother had told the children that the Agency was trying to take them away from her.

In the report for the detention hearing, filed on May 7, 2015, the social worker related that, in addition to the serious deterioration of the property and major concerns regarding the ongoing neglect of the children, "there are also concerns over the mental

health and anger issues of the mother that appear to severely impair her ability to provide for the basic needs and healthy functioning of her children, with [C.B.] also requiring mental health assessment." The social worker also reported that the older children did not appear to be regularly attending school.

During the April 30, 2015 visit to the property, Father appeared to be under the influence, and seemed paralyzed at times and uncertain about speaking to the social worker unless instructed to do so by Mother. During that visit, it took hours to finally reach agreement on an interim safety plan, due to Mother's lack of cooperation and volatile, erratic behavior. Under the plan, the children went to stay temporarily with their paternal grandmother, although five days later the grandmother informed the social worker that she could no longer care for the children because she was unable to manage their behaviors. The children were therefore detained by the Agency.

Regarding Native American status, Mother had told the social worker that she is affiliated with the Yokayo Rancheria Tribe, which she said is " 'no longer federally recognized.' " Father stated that he has no Native American heritage.

In an addendum to the detention report, filed on May 11, 2015, the social worker reported that a fifth child, 15 years old, had been in the care of his maternal grandmother from the age of six or seven, and would remain in her care. The social worker also reported that Mother and Father had both voluntarily agreed to submit to a random drug test on May 7. Mother had preliminarily tested positive for Tetrahydrocannabinol (THC) and methamphetamine, while Father never arrived at the Agency for testing.

Mother testified at the May 12, 2015 detention hearing that she was upset when the social worker and law enforcement came to her property on April 30, but she denied yelling or barricading her children in her van. Since the children were removed, Mother had taken steps to clean up the property, which is owned by the Yokayo Tribe of Indians, including removing the trash from the trailer and adding another bed. The trash outside the trailer had also been removed. There had always been a working generator and access to running water on the property. There was also a port-a-potty. The children bathed every other day at the nearby house of Mother's cousin. The family was in the

4

process of fixing up another house on their property, and Mother's grandmother had said that Mother and the youngest children could stay with her until the new house was livable. Mother did not believe the condition of the property prior to the cleanup was hazardous to the health or safety of the children. N.B. was not attending school due to a medical issue with his eardrum and C.B. had been attending school "until an incident a few months back." Mother also testified that she and Father used marijuana.

Social worker Jannee Dale also testified at the hearing. She and other Agency staff had visited the family's property on April 29, 2015, after receiving three referrals about the condition of the property and incidents involving the oldest child, C.B., who apparently was not attending school. Dale had arranged for tribal representative Lorraine Laiwa to meet her at the property, but Laiwa had arrived early and left before Dale arrived. Once there, Mother stepped between Dale and the trailer and refused to let her see inside the trailer or talk to the children.

The following day, the Agency obtained a warrant and Dale returned to the property with police, who served the warrant. During the three-and-one-half-hour visit, the children were primarily inside the van, but there were a few points when they were not. Dale described the garbage, the fire, and the strong smell of garbage, smoke, and burning plastic on the property. Mother was very upset and yelled a lot, and tried to call Laiwa several times during the visit. Ultimately, the Agency and the parents worked out a safety plan that allowed the paternal grandmother to care for the children, instead of the Agency detaining them.

There had been a total of 29 or 30 referrals for the property since 2008. The Agency had previously worked with the family three times to attempt to clean up the property. Dale believed the living conditions were hazardous in April 2015, because there were toxic fumes from burning plastic; there was rotten food throughout the trailer; there was a bottle of apple juice on the ground right next to bottles of Pinesol, within reach of the children; and there were soiled diapers all over the property. There were also concerns about the older children's school attendance. Dale did not believe it was safe to return the children to Mother, even assuming the property had been cleaned up. She

5

believed the family needed services, given that she had already worked with them for three months the prior year, and yet the problems "continue[d] to happen over and over again." Dale was also concerned about mother's emotional stability and wanted to ascertain whether her issues could be addressed by a doctor or therapist. Another concern involved the parents' substance abuse.

At the conclusion of the hearing, the juvenile court reaffirmed a prior temporary detention order, due to a longstanding problem with the home not meeting minimum community standards and the probability that conditions, even if they had improved temporarily, might deteriorate again and present a risk to the children.

In the jurisdiction report filed on June 2, 2015, the social worker reported that the children were placed together in foster care. C.B. had had 25 unexcused absences from school between January and March 23, 2015. C.B. was mimicking Mother's behaviors in her placement, including disregard for rules, bullying, and trying to get the other children to follow her defiant, disrespectful behaviors. C.B. was receiving counseling services and the other three children had been referred for medical, mental health, and educational evaluations and services.

Mother had tested positive for THC five times in May. The social worker had referred the parents for substance abuse treatment and assessment and to "In-take support services." In May, the social worker had contacted Consolidated Tribal Health to inquire about the availability of culturally appropriate parenting, hygiene, and nutrition classes, but was informed no such classes were available. She was currently trying to obtain resources and information for the parents from the outreach program coordinator at Consolidated Tribal Health. The parents had weekly supervised visitation with the four children removed from their care, as well as with their older son. The Agency had also provided Mother and the maternal grandmother with gas vouchers for transportation to visitation.

On June 17, 2015, the Agency filed an amended petition with additional allegations under section 300, subdivision (b)—that Mother had a current substance

6

abuse problem—and subdivision (c)—that N.B. was exhibiting behaviors that indicated emotional damage.

At the June 18, 2015 jurisdictional hearing, both parents waived their rights, the parties agreed to language for a second amended petition, and the court sustained the allegations of the amended petition, which dismissed the allegations under section 300, subdivision (b)(4) regarding the events observed at the family residence by Agency personnel on April 30, 2015.

At the conclusion of a June 25, 2015 hearing regarding an out of county placement for the oldest daughter, C.B., the juvenile court stated that there had been an attempt to place C.B. with the paternal grandmother, but, when the grandmother could not deal with C.B.'s behaviors, she had been placed in a local facility where there were issues regarding her interactions with other children and her self-injurious behavior. The court found that the social worker had diligently looked for a closer facility for C.B. that would provide a higher level of safety and supervision, but she was not able to find an appropriate placement that was closer than the facility in which she had been placed, which was a three-hour drive from her parents.

In the disposition report filed on July 9, 2015, the social worker reported that Mother had tested positive for THC on several occasions in June; on June 24, she had obtained a medical marijuana recommendation. Also in June, Mother had participated in an alcohol and drug assessment, and had been determined to be in need of treatment for cannabis abuse. She was being referred to a culturally appropriate treatment program at Consolidated Tribal Health.

During a family team meeting on June 29, 2015, attended by Agency staff, Mother and the maternal grandmother, case plans were developed for the family, which contained service objectives for Mother related to meeting the children's physical, emotional, medical, and educational needs; maintaining a relationship with the children through visitation; staying sober and showing the ability to live free from alcohol and drug dependency; consistently, appropriately, and adequately parenting the children; and

7

complying with medical or psychological treatment.[3] Two days later, the social worker met with both parents to go over and sign the case plans.

The three younger children were not placed together in foster care due to the lack of available foster homes. Mother had demonstrated that she was invested in having her children returned to her, attending every visit, attending two family team meetings, and making substantial progress in cleaning the property. She still needed much support, however, because, as the social worker explained, "this is not merely a situation of a dirty house. This is a situation with a multitude of neglect [*sic*] of these four children who are too young to understand and have been segregated from society in mom's effort to protect her children from 'outsiders.' These children are seriously delayed in their academic as well as emotional and social skills."

The Agency recommended continued out of home placement for the children and reunification services for the parents.

At the July 15, 2015 dispositional hearing, Lorraine Laiwa testified that she had been the director and case manager for the Indian Child and Family Preservation, a consortium of four tribes, for 20 years. She had been qualified as an Indian expert witness in Mendocino County Juvenile Dependency Court 30 to 40 times. Laiwa had worked with every tribe in Mendocino and Lake Counties as an ICWA worker, including one year for the Big Valley Band of Pomo Indians (Big Valley Tribe). She was familiar with the prevailing social and cultural standards of the Indian community with respect to child rearing practices. Laiwa was asked to be an expert in this case by the Agency and the Big Valley Tribe. She had reviewed the petition and all of the reports filed in this case. She also had spoken about the case with the social worker, with Big Valley tribal representatives, and with the parents.

---

[3] Proposed services for Mother included visitation support, participation in a substance abuse assessment and completion of all treatment recommendations, drug testing, participation in culturally appropriate anger management and parenting education programs, and participation in a psychological evaluation and completion of all treatment recommendations.

Although the family's property had been cleaned up when Laiwa was there a few weeks earlier, she did not believe the children should be returned to the home until more was done to make it a safe place for them. There was another property the tribe was considering for the family, but the house there was old and needed a great deal of work. Other issues that concerned Laiwa included Mother's positive drug test for methamphetamine. Father had said he was taking medication that "was making [him] feel out of it," and Laiwa believed there might be a connection between substance use, prescription medication, and the condition of the home.

Laiwa had learned that Mother and her oldest daughter, C.B., were eligible for Big Valley tribal membership. She did not know about the eligibility of the rest of the children.

In the circumstances of the case, Laiwa believed that the parents' continued custody of their children at present was likely to result in serious emotional and physical damage to the children. She had spoken with the tribal representative and one of the council members, and they also believed it would be detrimental to return the children "until things are fixed up for the family and a more permanent home for them [*sic*]." Both Laiwa and the tribe believed it was in the children's best interest to be placed in foster care until a relative placement could be found or until another suitable placement, approved by the tribe, was found.

On cross-examination, Laiwa testified that she had met with Mother about four times since becoming involved with the case, and Laiwa believed Mother "loves her children very much." She did not know what remedial services the Agency had offered the family.

Nancy Hernandez, ICWA coordinator for the Big Valley Tribe and social services coordinator for four Rancherias, testified that, of the four children, C.B. was an enrolled member of the Big Valley Tribe and the other three children—N.B., W.B., and K.B.— were eligible members because Mother was an enrolled member.

The social worker on the case, Jannee Dale**,** again testified that she had worked with the family starting in September 2014, and, with the participation of Laiwa, had put

in place a "risk reduction plan," which was a written agreement between the Agency and the parents that attempted to mitigate the risks to the children. Dale had inquired at that time about tribal resources that might be available for the family but, because their tribe is not federally recognized, there was no assistance available. She was able to get them food and clothing vouchers. She had also worked with Mother about trying to request an individualized education program for N.B., who was extremely sensitive to noise. Subsequently, in March 2015, Agency staff went to the home and saw that it was in worse condition than it had been initially.

In April 2015, the Agency prepared a safety plan for the children, which involved them staying with the paternal grandparents while the Agency worked with the family to try to alleviate their problems, including the hazardous conditions at the residence, Mother's hostility and possible mental health issues, and Father's being under the influence. The purpose of the safety plan was to avoid having to detain the children while dealing with the family's issues. Shortly thereafter, the grandmother said she could not take care of the children due to their behavioral issues, which were affecting her health. The Agency therefore placed the children in foster care.

Since the children were detained, Mother had been cooperating with the Agency in terms of drug testing and participating in a substance abuse assessment.[4] The Agency had also begun discussions with her about treatment options. At the first of two family team meetings in mid- to late May 2015, the social worker had talked with Mother about getting a psychological evaluation to be able to properly tailor mental health services, and had discussed with her the possibility of working with a particular family counselor regarding anger management issues and another counselor regarding mental health issues. At the second family team meeting on June 29, the social worker had discussed with Mother the possibility of her obtaining anger management services. The purpose of the family team meetings was to determine what services were needed and to develop the

---

[4] After her first positive drug test for methamphetamine, Mother had tested approximately a dozen times, and had not tested positive for methamphetamine again.

case plan. Dale testified that she had planned to request an order for a psychological assessment at the dispositional hearing, which is when the Agency typically made such a request. On cross-examination, Dale said she was not aware that Mother had obtained a mental health assessment on her own and was beginning mental health services at Consolidated Tribal Health.

Following Dale's testimony, Laiwa was recalled as a witness. Based on her experience, and after listening to the social worker's testimony, Laiwa testified that she believed the Agency had made active efforts to avoid having to remove the children from their home. She also believed that the Agency's efforts were consistent with customary tribal efforts in child rearing because "they provided all kinds of services for the family so that something like this would never occur. They were there to help them to look at avenues of how to keep their families together. Because I understand, and I know, that there were many, many referrals on this family before."

On cross-examination, Laiwa testified that she understood "active efforts" under ICWA to mean "working with our different agencies that provided the services that would be helpful to an Indian family."

Mother testified at the hearing that she was asking the court to return all four of the children to live with her in the trailer, which now contained three beds and had been cleaned up since the children were removed. The trash on the property had also been removed. Mother planned to obtain a garbage bin to dispose of garbage daily.

In May 2015, the Agency had given Mother a referral for a substance abuse assessment and evaluation, which she completed in June. The evaluator had recommended that she seek treatment for cannabis dependency and the social worker had given her a referral to the "Intake Support" group; she had already attended three meetings. The social worker had not yet given her any other referrals for services, although Mother, on her own, had begun a mental health evaluation the previous day.

At the conclusion of the evidence, Mother's attorney argued that Laiwa, the ICWA expert, "had no understanding of what active efforts are" and expressed doubt about how much weight her testimony should be given. The court addressed counsel's concerns,

stating: "Ms. Laiwa is quite modest. I think I've seen her testify as an ICWA expert in excess of 50 times. She is a respected tribal elder. She's worked with virtually all the tribes in our local area in Mendocino and Lake County. And while she may have used words slightly different than the words in the statute, I know she understands what active efforts are." The court acknowledged that "she needed to have her memory jogged with the voluminous information that is in these reports and the file, and she did testify twice. Nevertheless, I did find her expert testimony on the salient reports' points required by ICWA to be, based on the evidence, to be credible and to satisfy the intent of the act."

The court then turned to the merits of the case and found that the parents had made significant efforts toward cleaning up the residence, that they had made efforts to get involved in services, and that they were "extraordinarily committed to their children. They love their children." The court nonetheless found that, in light of the state of the home when the children were removed and the 25 referrals on the condition of the home over several years and its repeated deterioration, there was a concern that the residence would again deteriorate into a condition that was unsafe for the children. The court also acknowledged that 13-year-old C.B. had been placed far away, in Sacramento, which was not optimal. But the court believed that the Agency had made "extraordinary efforts to try to find a closer placement" for her, including a relative placement. The court noted that C.B. had exhibited "numerous and dangerous and difficult" behaviors since removal. Based on various concerns, including the possibility that the parents were using C.B. to make hospital emergency room visits as part of drug-seeking behavior, the court was concerned about the parents' current ability to safely care for C.B. as well as the other children.

The court found that reasonable efforts had been made to eliminate the need to remove the children from the home and further found, by clear and convincing evidence, that there was a substantial danger to the children's physical and mental health and safety to return them to the home, and "that active efforts were made to provide remedial services designed to prevent the breakup of the Indian family, and these efforts proved unsuccessful." The active efforts included a risk reduction plan and a safety plan prior to

12

detention, which Laiwa believed were the types of services and efforts she would expect to see prior to removal of the children from the home. The Agency had also consulted with and complied with the wishes of the tribe regarding the children's placement. The court ordered the Agency to continue assessing the viability of a relative placement and to attempt to find a placement closer to home for C.B. The court also ordered reunification services for the parents.

On July 23, 2015, Mother filed notices of appeal as to each of the four children.

## DISCUSSION

Mother contends the juvenile court erred when it found that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of this Indian family, pursuant to ICWA.

"California courts have been inconsistent in the standards they apply to review a finding that active efforts had been made to provide services and programs designed to prevent the breakup of an Indian family." (*C.F. v. Superior Court* (2014) 230 Cal.App.4th 227, 238-239 (*C.F.*).) We agree with the conclusion of Division Four of this District in *C.F.* that the substantial evidence test is the appropriate standard of review, especially where, as here, a juvenile court's finding on active efforts involves credibility determinations. (*Id.* at p. 239.)[5]

"Congress passed the ICWA in 1978 'to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children "in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." ' [Citing, inter alia, 25 U.S.C. § 1902.] [¶] The ICWA's procedural and substantive requirements must be followed in involuntary child custody proceedings when an 'Indian child' is involved.

---

[5] Moreover, even if the standard of review for whether the services provided constituted active efforts was de novo, as Mother argues it should be, we would reach the same result. (See, e.g., *In re K.B.* (2009) 173 Cal.App.4th 1275, 1286 [citing Alaska case law in concluding that, when services provided could be found in record, active efforts determination would be a mixed question of law and fact, reviewed independently].)

13

An 'Indian child' is defined by the ICWA as 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4).)" (*In re Jeffrey A.* (2002) 103 Cal.App.4th 1103, 1106.) In this case, it is undisputed that the four children are Indian children for purposes of ICWA.

Section 361.7 addresses standards for involuntary foster care placement of or termination of parental rights over an Indian child, requiring a child welfare agency to provide evidence "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (§ 361.7, subd. (a).) "What constitutes active efforts shall be assessed on a case-by-case basis," and the efforts must "be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).) In addition, under subdivision (c) of section 361.7, "[n]o foster care placement or guardianship may be ordered in the proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of a qualified expert witness, . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[6]

Neither ICWA nor section 361.7 provides a definition of active efforts. (*C.F.*, *supra*, 230 Cal.App.4th at p. 240; see 25 U.S.C. § 1912(d); cf. *In re K.B.*, *supra*, 173 Cal.App.4th at p. 1287 [setting forth "a useful guideline" for distinguishing passive

---

[6] Section 361.7, enacted in 2006, tracks the language of title 25 United States Code section 1912(d), which is part of ICWA and provides: "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

14

efforts from active efforts: " 'Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own' "].) However, recently updated guidelines issued by the Bureau of Indian Affairs (BIA), which were intended to provide guidance to state courts and child welfare agencies implementing ICWA's provisions, explain that active efforts "are intended primarily to maintain and reunite an Indian child with his or her family or tribal community and constitute more than [the] reasonable efforts" required in most dependency cases. (Department of the Interior, BIA, Guidelines for State Courts; Indian Child Custody Proceedings, 80 Fed. Reg. 10146, 10150, ¶ A.2, (Feb. 25, 2015) (Guidelines).)[7]

---

[7] The Guidelines contain examples of active efforts, including: "(1) Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s); [¶] (2) Taking steps necessary to keep siblings together; [¶] (3) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services; [¶] (4) Identifying, notifying, and inviting representatives of the Indian child's tribe to participate; [¶] (5) Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement; [¶] (6) Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting the assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards; [¶] (7) Offering and employing all available and culturally appropriate family preservation strategies; [¶] (8) Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal; [¶] (9) Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child; [¶] (10) Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal; [¶] (11) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those resources; [¶] (12) Monitoring progress and participation in services; [¶] (13) Providing consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available; [¶] (14) Supporting regular visits and trial home visits of the Indian child

15

The updated Guidelines clarify that the active efforts requirement "begins from the moment the possibility arises that an agency case or investigation may result in the need for an Indian child to be placed outside the custody of either parent . . . in order to prevent removal." (Guidelines at p. 10152, ¶ B.1(a).) The party attempting to place an Indian child in foster care must also "demonstrate to the court that prior to, and until the commencement of, the proceeding, active efforts have been made to avoid the need to remove the Indian child from his or her parents or Indian custodians and show that those efforts have been unsuccessful." (Guidelines at p. 10156, ¶ D.2(a).)

In the present case, Mother claims the Agency failed to make active efforts, arguing in particular that the social worker "should have immediately referred Mother to either anger management or mental health assessments," but did not do so. We agree with the Agency that there is substantial evidence to support the juvenile court's finding that active efforts were made to prevent the breakup of this family. (See § 361.7, subd. (a).)

This evidence of active efforts includes the fact that the Agency began working with the family in September 2014, developing a risk reduction plan to prevent removal. Then, in April 2015, when the Agency found the residence in worse condition than ever, it worked with the parents to create a safety plan to avoid detention of the children, placing the children with their paternal grandparents while working on the family's problems. These were the types of efforts and services ICWA expert Lorraine Laiwa said she would expect to see prior to removal of the children from the home.

The Agency only detained the children after the grandparents indicated they could no longer care for the children. The Agency had also consulted with the tribe regarding the children's placement, and both Laiwa and the tribe believed it was in the children's

during any period of removal, consistent with the need to ensure the safety of the child; and [¶] (15) Providing post-reunification services and monitoring." (Guidelines at p. 10150, ¶ A.2.)

16

best interest to be placed in foster care until a relative placement could be found or until another suitable placement, approved by the tribe, was identified.

Moreover, it was only during the April 30, 2015 visit to the residence that the Agency became aware of Mother's potential drug, mental health, and anger issues. Since detention, the Agency had worked with Mother to obtain a substance abuse assessment and drug testing, and had begun discussing treatment options with her; it had also referred her to "In-take support services." In addition, the Agency had arranged for two family team meetings, in May and June, in order to determine what services were needed and to develop a case plan. At the first meeting, the social worker had talked to Mother about getting a psychological evaluation, to be able to tailor mental health services to her needs, and also about the possibility of working with one particular Native American counselor regarding anger management issues and another regarding mental health issues. Dale planned to request an order for a psychological evaluation at the dispositional hearing. At the second family team meeting, the social worker had discussed with Mother the possibility of her obtaining anger management services.

In addition, in May, the social worker had contacted Consolidated Tribal Health regarding the availability of culturally appropriate parenting, hygiene, and nutrition classes, but was told that no such classes were available. Both the social worker and Mother testified that Mother had been referred to the Intake Support group, which apparently involved dealing with her anger and denial issues related to Agency intervention, and Mother testified that she had already attended three meetings. The social worker was presently trying to obtain resources and information for the parents from the outreach program coordinator at Consolidated Tribal Health. Also in May, C.B. had begun receiving counseling services and the other children had been referred for medical, mental health, and educational evaluations and services. The parents had regular supervised visitation with the children and the Agency had provided Mother and the maternal grandmother—who was caring for the oldest son—with gas vouchers for transportation to visitation.

17

Mother argues that the Agency should have provided mental health and anger management services earlier, before the children were removed from the home. It must be remembered, however, that Mother's possible mental health, anger, and substance abuse issues did not even come to light until the visit to the home at the end of April. After that, as previously discussed, the Agency did arrange for a substance abuse assessment and testing, began looking for culturally appropriate services, and held two family team meetings to begin to formulate a case plan, which would take effect following the court's order of reunification services at the dispositional hearing.[8]

Mother compares the facts of this case with *In re K.B.*, *supra*, 173 Cal.App.4th 1275 in which the social services agency had provided the mother with numerous services to assist her in reunifying with her children and the appellate court had found that the agency had made active efforts when it "provided the mother with the resources necessary to achieve the goals of her case plan." (*Id.* at p. 1287.) In *K.B.*, however, the active efforts determination was made following termination of parental rights, after many months of reunification services. Here, on the other hand, only two months had elapsed between detention and the dispositional hearing, and the Agency had been actively working with Mother to develop a case plan and arrange for services relevant to Mother's substance abuse, mental health, and anger issues. Hence, *In re K.B.* and the present case are not comparable.

Finally, ICWA expert Laiwa believed the Agency had made active efforts to avoid having to remove the children from their home and that the Agency's efforts were consistent with customary tribal efforts in child rearing. Although Mother asserts that we should not give much weight to Laiwa's testimony, arguing that she did not understand the meaning of active efforts under ICWA, the court found otherwise. The court stated that Laiwa is a respected tribal elder who had worked with virtually all of the tribes in the

---

[8] Mother's proposed case plan included, inter alia, participating in a psychological evaluation and following all treatment recommendations, and participating in culturally appropriate anger management and parenting education programs.

area; the court had seen her testify as an ICWA expert more than 50 times. While acknowledging that she may not have used the exact words of the statute and did need to have her memory jogged "with the voluminous information" in the case files, the court found that her testimony was credible and satisfied the intent of ICWA.

In light of all of the evidence in the record of the Agency's efforts, both before and after detention, as well as Laiwa's expert opinion that the Agency had satisfied ICWA's active efforts requirement, we conclude substantial evidence supports the juvenile court's finding that the Agency made active efforts in the circumstances of this case "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family," but that these efforts had been unsuccessful. (§ 361.7, subd. (a); see *C.F.*, *supra*, 230 Cal.App.4th at p. 239; see also 25 U.S.C. § 1912(d); Guidelines, ¶¶ A.2; B.1(a); D.2(a).)

## DISPOSITION

The orders appealed from are affirmed.

_____
Kline, P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

19