Filed 6/16/16  In re Gianna S. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Gianna S., A Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.S., <br><br> Defendant and Appellant. | A144617 <br><br> (Sonoma County Super. Ct. No. 4429-DEP) <br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> **[NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed May 23. 2016, be modified as follows:

Footnote 7 is added to the end of the continued paragraph on page 27 ending with "Gianna and mother together."  Footnote 7 shall read:

"Our conclusion that active efforts were provided in this case is not altered by the recent adoption of revised federal guidelines which elaborate on what is required to establish such efforts under the ICWA.  (See Bureau of Indian Affairs, Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed.Reg. 10146, 10150-10151 (Feb. 25, 2015) (2015 Guidelines).)  As stated above, California's heightened  standard for providing reasonable services already complies with the ICWA's active efforts requirement.  (*C.F.*, *supra*, 230 Cal.App.4th at p. 238 & fn. 7.)  And, indeed, many of the examples of active efforts articulated in the 2015 Guidelines were provided by the Department in this case."

There is no change in judgment.  Appellant's petition for rehearing is denied.


Dated: _____                    _____, J.

Filed 5/23/16  In re Gianna S. CA1/4 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Gianna S., A Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>C.S.,<br><br>   Defendant and Appellant. | A144617<br><br>(Sonoma County<br>Super. Ct. No. 4429-DEP) |

In this dependency appeal, C.S. (mother) seeks relief from a juvenile court dispositional order removing her daughter, Gianna (born Oct. 2009), from her physical custody and denying her reunification services in accordance with section 361.5, subdivision (b)(13), of the Welfare and Institutions Code (subdivision (b)(13)).[1]  On appeal, mother argues that the juvenile court:  (1) improperly interpreted subdivision (b)(13) to allow for bypass of reunification services even though mother had not previously been treated for "extensive, abusive, and chronic" substance abuse; (2) erroneously refused to order reunification services in Gianna's best interests pursuant to subdivision (c) of section 361.5; and (3) incorrectly found, under the Indian Child

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

1

Welfare Act (ICWA), 25 U.S.C. § 1901 et seq., that sufficient "active efforts" were made in this case to prevent the breakup of the Indian family. Having reviewed this matter in some detail, however, we see no reversible error and therefore affirm the juvenile court's dispositional order.

## I. BACKGROUND

Mother—who is an enrolled member of the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (Tribe)—has a long and unfortunate history with the Sonoma County Human Services Department (Department). After ten child welfare referrals involving mother as a minor, she was, herself, made a juvenile court dependent from 1996 through 2003. Mother reported that she was born addicted to heroin and that both of her parents struggled with substance abuse. She also stated that she was raped while in placement under the care of the Department. In April 2001, at age 15, mother was arrested on a battery charge, which was ultimately dismissed. However, according to the case closure summary report which was filed in connection with the termination of her dependency in 2003, mother had demonstrated, during the previous two years, "a pattern of escalating self-injurious and assaultive behaviors that necessitated numerous psychiatric hospitalizations in acute care facilities." As a result, she was referred to the county conservator and committed to the state hospital. Thereafter, in May 2004, at age 18, mother was detained for resisting a public officer.

Gianna's presumed father, William R., and mother began co-habitating in approximately 2005 and married in 2008.[2] In December 2008, mother was arrested for unlawful possession of a controlled substance (Bus. & Prof. Code, § 4060); being under the influence of a controlled substance (Health & Saf. Code, §11550, subd. (a)); and possession of controlled substance paraphernalia (former Health & Saf. Code, § 11364.1, subd. (a); see now id., § 11364, subd. (a)). In connection with these charges, mother was court ordered into a deferred judgment program. Subsequently, in September 2009—

---

[2] Father was granted reunification services at the dispositional hearing at issue in these proceedings. He has not appealed and is therefore not involved in this matter.

after she successfully completed drug treatment and the drug court program—the criminal matter was dismissed.  Gianna was born one month later, in October 2009.

In June 2011, the Department received a referral alleging general neglect of then 20-month-old Gianna by her parents.  The reporting party—a representative of Tribal TANF[3]—had received a phone call from mother in a bar, stating that she was drunk and wanted to hurt herself, although she did not have a plan to do so.  The police responded, but did not detain mother.  Instead, they recommended a detox/drug treatment program for her.  According to the referral, mother and father then argued the next day about her infidelity.  Although father was intoxicated, mother left Gianna in his care and went to her bedroom to lie down.  Reportedly, father then went looking for the man mother had been involved with, leaving Gianna unattended.  When mother woke up and discovered this, she was so upset that she locked herself in the bathroom with a box cutter and started cutting herself.  She claims, however, not to have been suicidal.  At some point, father returned and mother was taken to a psychiatric hospital where she was held overnight.

The social worker substantiated the neglect referral.  Both parents admitted to using methamphetamine and drinking alcohol.  In addition, at the time of her hospital admittance, mother tested positive for tetrahydrocannabinol (THC), the primary intoxicant in marijuana.  Further, both parents admitted that they had used drugs together throughout their relationship, other than the period when mother was pregnant and breastfeeding Gianna.  However, after Tribal TANF cut their aid due to their substance abuse, the parents claimed to have had "an awakening."  Mother was attending Narcotics Anonymous (NA) meetings and a women's recovery group through Tribal Health.  In addition, both parents were required to do random drug testing for Tribal TANF and had consistently tested negative for methamphetamine.  After the social worker referred the

---

[3] Temporary Assistance to Needy Families (TANF) is a federal block grant program that replaced Aid to Families with Dependent Children (AFDC).  Under the law, federally recognized tribes have been given the authority to independently design, administer, and operate their own Tribal TANF programs.  (See California Department of Social Services, *About Tribal TANF*, California Tribal TANF Program <http://tribaltanf.cdss.ca.gov/PG253.htm> [as of May 20, 2016].)

parents to therapy and parenting classes—and the caseworker from Tribal TANF stated that she would "continue to require the family to drug test and check in with them frequently regarding the state of their relationship"—the Department closed the case.

In December 2012, however, the Department received another referral alleging neglect of Gianna. Specifically, the reporting party indicated concern about the parents' ability to provide care for Gianna and stated that mother had not followed through with a recommendation that she engage in residential drug treatment. In addition, father had reportedly been in the hospital over the weekend after allegedly overdosing on heroin and mother's pain medication. According to the reporting party, father was Gianna's primary caregiver due to mother's mental health issues, which impaired her ability to care for the minor.

When the investigating social worker interviewed the parents, father reported that he did not use heroin, but was prescribed Norco for a back injury. With respect to the incident in question, father stated that the family was out and he was having back pain, but had forgotten his pills. Mother claimed that she gave him what she believed to be one of her prescription Percocet pills, but accidentally gave him, instead, one of her prescribed Methadone pills, after which father had a seizure and was hospitalized. As for mother's failure to engage in residential drug treatment, mother reportedly made several excuses, some of which seemed valid and some of which seemed to just be excuses. After the social worker emphasized the need for mother to engage in treatment in order to care for her daughter safely, mother quickly made arrangements for outpatient services through Turning Point, developing a treatment plan which included pain management, mental health management, substance abuse treatment, and parenting classes.

The Department substantiated the neglect referral, and closed the case the next month. The social worker, however, stressed to the parents that father's stability was the family's "saving grace," and that he had concluded that there was no imminent danger to Gianna given father's role in her life. He further explained that "should another referral be received, and should [mother] not follow through with engaging in services, the

4

Department would be forced to take a more aggressive role with the family in an effort to ensure that Gianna [was] being cared for appropriately."

Several months later, in May 2013, the police responded to the parents' home. Mother was agitated and stated that father had attacked her after they argued over infidelity. Specifically, mother claimed that the couple were fighting over the cell phone, which she was holding against her chest, and during the struggle she was scratched in multiple locations on her chest and neck. As a result, the police arrested father for corporal injury to a spouse. Later, however, mother admitted under oath that she had made the whole thing up, cutting herself with the cell phone. Thereafter, according to father, mother attempted to run him over with a car on October 31, 2013.

Then, on May 12, 2014, at 1:45 a.m., a Sonoma County Sheriff's deputy stopped the car mother was driving for a traffic violation. Four-year-old Gianna was asleep in the back seat. Upon approaching the car, the deputy noticed signs that mother might be under the influence of a controlled substance. He observed a large amount of currency on the passenger seat and a burnt marijuana roach in the ashtray. Mother admitted that she also had marijuana and prescription medication in the vehicle. In addition, a capped syringe was discovered under mother's shirt leaking brown fluid, which she confirmed was heroin. The officer also found several empty syringes and a glass pipe containing what looked like burnt methamphetamine in mother's purse. A subsequent search of the vehicle revealed additional heroin and more syringes in another purse owned by mother, a small digital scale, and a glass pipe containing burnt marijuana in the glove compartment. As a result of this incident, mother was taken to the county jail, cited for possession of paraphernalia, and released with Gianna.

After the Department received a referral based on mother's May 2014 arrest, the social worker contacted the Tribe's ICWA representative, Liz DeRouen, to schedule a joint home visit. Although Liz was unavailable, Laila DeRouen (interchangeably with Liz, the ICWA Representative) accompanied the social worker for an unannounced visit on June 16, 2014. At that time (10:45 a.m.), mother was still asleep and the living space was in "complete disarray," with piles of clothing, boxes, and other items piled

5

everywhere and crumbled cookies and food stains on the floor. When she emerged from the bedroom, mother—who appeared not to have showered "for awhile"—became belligerent and yelled repeatedly at the social worker. When she realized she had missed a medical appointment, she "started hitting herself on the head and began to cry uncontrollably." Later, when Gianna came into the room and observed her mother "crying, screaming, and swearing," her eyes were opened widely, and she "quickly pulled the hoodie on her shirt over her head and ran away."

Mother has been diagnosed with myofacial syndrome which causes her pain. Mother admitted that she had been using heroin to help with her back pain, most recently "about a week ago." Father reported that mother received methadone, Dilaudid, and Oxycontin from her doctor, remarking that mother "takes so much medication that it's a wonder she is still walking." Both parents confirmed that mother abused her prescription pain medication. In the end, father agreed that both he and mother would drug test that day. However, although the social worker reminded him that they would both need identification (ID), the parents later called and said that they were unable to drug test because they did not have ID with them.

On June 17, 2014, the social worker called the parents to inform them that a Team Decision Meeting (TDM) would be held the next day with respect to Gianna. When she spoke with mother, however, mother stated that "she was planning to take her daughter, Gianna, to a place where no one would know where she is and no one could get their hands on her." As a result of this conversation, the social worker decided to seek a protective custody warrant from the juvenile court and take Gianna into custody that day. She informed the ICWA Representative of the situation and scheduled an emergency TDM for that afternoon.

Both parents and the ICWA Representative attended the TDM to discuss the emergency placement of Gianna. Father was unable to suggest any acceptable placement options for the minor. The ICWA Representative also called "numerous possible placements," but was unsuccessful in locating a viable option for Gianna. As for mother, she was volatile during the meeting and was therefore asked to leave. Father reported

that Gianna was with the maternal great-grandmother, but by the time the social worker and the ICWA Representative arrived, mother had absconded with Gianna on foot. The juvenile court issued a protective custody warrant that day. The next day, the Department filed a petition pursuant to subdivision (b) of section 300, alleging that Gianna was at serious risk of harm due to mother's substance abuse problem and the parents' issues with domestic violence. At the detention hearing on June 19, 2014, the juvenile court formally detained Gianna, although her whereabouts remained unknown. Father and the ICWA Representative were present.

Gianna was finally placed in protective custody a week later when, on June 24, 2014, the maternal great-aunt contacted the social worker and indicated that she would be bringing mother and Gianna into the Department so that Gianna could be removed. When they arrived, mother took Gianna into the bathroom and had to be coaxed by the maternal great-aunt until she eventually emerged. At that point, "[mother's] head and hair was completely drenched with water as though she had just washed her hair in the bathroom sink and she was brushing it. The water was covering the top half of her shirt and she was wide-eyed, crying, and looked scattered and frightened. Gianna had an awkward smile on her face and looked unaware of the chaotic scene she stood in the middle of." Mother continued to act erratically. Despite being in a lobby filled with clients and social workers, mother vacillated between crying and speaking in a loud, angry voice, yelling at one point: "Are you going to take her to Valley of the Moon, so she can get raped just like I did?!?" Ultimately, after pushing away from her sobbing mother's hug, Gianna was able to easily separate from her.

The social worker then spent an hour with mother and the maternal great-aunt, trying to calm mother down, as she was still sobbing uncontrollably. During this conversation, mother stated that she had no reason to live and was going to kill herself. She also stated that "she wanted to 'go into a hole with my daughter' and that she needed Gianna for emotional support." In addition, mother admitted that she was abusing pills that were not prescribed for her and that she had used heroin. The social worker believed that mother was under the influence and also a possible safety threat to herself. She

7

therefore called the ICWA Representative to discuss treatment options, and together they decided that mother should be psychiatrically evaluated at the Sonoma County Indian Health Project (SCIHP), where she received medical treatment.

Subsequently, the medical social worker at SCIHP informed the Department social worker that mother was under the influence when she arrived and tested positive for amphetamine, methamphetamine, oxycodone, methadone, morphine, and THC. He further stated that, during his assessment, mother presented as " 'really scattered, hard to track, and she couldn't sit still.' " Ultimately, the SCHIP social worker concluded mother did not meet the criteria for a psychiatric hold, but he referred her to Sutter Hospital to detox from the drugs.

The following day, Wednesday, June 25, 2014, the Department social worker thought mother might be under the influence of opiates because she was much more subdued and listless. Moreover, the social worker remained concerned for mother's safety because she continued to intermittently sob and express despair, with some suicidal ideation. Ultimately, the social worker supported mother in her plan to attend an Alcoholics' Anonymous meeting and then go to Psychiatric Emergency Services (PES) for evaluation. The social worker asked mother to call her once she was settled to let her know how she was doing. Unfortunately, the social worker did not hear again from mother until Monday, June 30.

On that date, mother was "significantly mentally and emotionally distraught." Although she was unable to provide a clear chronology of events, the social worker gleaned that mother had gone to PES for psychiatric care, after her previous talk with the social worker on Wednesday the 25th, but was sent to the Orenda Center because she needed to detox. When she arrived at Orenda she was having muscle spasms, so 911 was called and she was taken to the hospital. Mother reported that she left the hospital against medical advice (AMA) and in her hospital gown. She further stated that, at some point on Friday, the 27th of June, she attempted to return to the Orenda Center but could not be admitted. She then " 'got drunk,' " and was walking aimlessly around Santa Rosa. Mother believed that she was sexually assaulted in the early morning hours of Saturday,

June 28, stating that she was eventually " 'found in a field' " and taken to the hospital. From there, she was sent to PES, where she spent the night of Sunday, June 29, before being released on the 30th. Throughout her recitation of events, mother was sobbing uncontrollably, difficult to understand "in her speech and thought," and appeared out of control.

Thereafter, on July 14, 2014, the Department filed its jurisdictional report, noting that ICWA applies to this case because mother is an enrolled member of the Tribe and Gianna is eligible for membership. Indeed, the Tribe had filed a formal resolution with the juvenile court on June 30, 2014, indicating that Gianna is an "Indian child" for purposes of the ICWA and that the Tribe was formally intervening in her dependency proceedings. With respect to the allegations in the petition, the social worker explained that she had difficulty obtaining a response from mother, both because mother was hard to reach and because her "significant mental and emotional instability and drug use" made her conversations "often erratic in nature, scattered, and tangential." The Department noted that mother continued to engage in dangerous behaviors, including substance abuse and putting herself in perilous situations, which demonstrated her inability to care for herself or a small child. It thus requested that the juvenile court establish jurisdiction and order two psychological evaluations for mother to determine her ability to successfully participate in family reunification. At the conclusion of the contested jurisdictional hearing on August 7, 2014, the juvenile court determined the allegations in the petition to be true, found Gianna to be a child described by subdivision (b) of section 300, and ordered the psychological evaluations as requested.

The Department filed its dispositional report on September 22, 2014. According to the report, mother had pled guilty in July 2014 to the drug-related charges filed in connection with her May 2014 arrest. She was found eligible for drug court, imposition of sentence was suspended, and she was referred to drug treatment. In addition, mother was ordered to obey all laws and not to possess or use any alcohol, non-prescribed drugs, or drug paraphernalia. And, she was required to submit to random drug testing. On August 12, 2014, mother reported to the social worker that she was referred to the Drug

9

Abuse Alternative Center (DAAC) for treatment and would be attending an intake appointment. The social worker, however, never received any confirmation that mother actually engaged with DAAC. Mother also told the social worker that she was involved with Santa Rosa Treatment Center for methadone maintenance, but, according to the social worker, mother's participation could not be confirmed and was reported by mother to have ceased after approximately one week.

Instead, mother's substance abuse and emotional instability continued. Father moved out of the family home, and indicated his intention to remain separated from mother. On August 31, 2014, he called the police after mother reported attempting suicide by taking approximately 100 Topamax pills and running from the house. The police located mother on the side of the road. According to the reporting officer, mother was sobbing and unresponsive to questions, "was unable to form words and sentences, and appeared to be in an altered state of consciousness." The officer determined mother to be a danger to herself and, in accordance with section 5150, detained her for psychiatric evaluation. She required restraints during her transfer to the hospital. Later, at the hospital, heroin and methamphetamine were found concealed inside a hypodermic needle cap in mother's bra. A small amount of marijuana was also found in her purse. The matter was referred to the District Attorney to file charges. In addition, according to father, he was informed that mother had tested positive " 'for all kinds of stuff.' "

Mother was eventually transported to PES for the remainder of her 5150 hold. On September 2, 2014, she was placed on an extended hold in another facility pursuant to section 5250. She was released on or about September 12, 2014. On September 15, 2014, the social worker met with mother and told her that she wanted to refer her for residential treatment. Mother, however, stated that she could not engage in such treatment because she had animals she needed to take care of—this, after just stating that she would participate in "any and all" services to reunify with Gianna.

Visitation with Gianna was reported to be relatively consistent and positive. However, according to the social worker, mother "has been observed, on occasion to be profusely sweating, exhibiting pressured and rapid speech, and tangential in her thoughts;

these are behaviors and symptoms often indicative of someone who is under the influence or entering withdrawal. [Mother] has also left the visits intermittently, often to retrieve items from the car, to the extent that it has been a noticeable behavior. On other occasions [mother] is loud and intense in her demeanor, with [father] frequently encouraging her to calm down." Additionally, Gianna had commented during visits that her parents let her " 'watch bad movies.' " And, during an August 2014 visit, "Gianna drank orange juice her mother brought her and immediately asked [her mother] if it was alcohol." Mother quickly explained that Gianna had snuck sips of her mixed drinks in the past.

According to the social worker's dispositional assessment, mother's "mental health and substance abuse problems are, individually, extreme; however, as they are co-occurring, chronic, and overwhelmingly untreated the sorrowful reality is the mother's prognosis for success in reunifying with Gianna is improbable." The Department therefore recommended denial of reunification services for mother in accordance with subdivision (b)(13), which allows for bypass of services when a parent is a chronic substance abuser who has resisted prior court-ordered substance abuse treatment. (§ 361.5, subd. (b)(13).) In advance of the dispositional hearing, the Department also provided the declaration of a designated Indian expert who stated that, in her expert opinion, continued custody of Gianna by her parents would cause the minor serious emotional or physical damage. According to the expert, the Tribe supported her recommendation of out-of-home placement for Gianna.

The dispositional hearing began on September 24, 2014. At the hearing, Gianna's attorney reported that Gianna had disclosed that mother had told her to keep secret mother's plan to have a man remove Gianna from her foster home. The social worker confirmed that Gianna had reported the same "secret" to her, the foster mother, and school personnel, and then cried because she felt bad for telling. The matter was continued for settlement conference, and mother was ordered to drug test immediately after court, as she had appeared under the influence to the social worker at a visit earlier in the day.

11

At the conclusion of the hearing, a bailiff and the social worker were accompanying mother to the probation department for drug testing when mother's "hostile behavior began to escalate, and she began screaming and cursing. . . . [She] refused to submit to a urine or swab drug test and became uncontrollable. While seated, [mother] began repeatedly banging the back of her head against the wall behind her and had to be placed in restraints. She repeated she wanted to die and was suicidal." As a result of this incident, mother was involuntarily detained pursuant to section 5150, transported to PES, and placed on an extended hold.[4]

After settlement proved unsuccessful, mother and the Tribe both contested the Department's recommendation that reunification services be denied, and the matter was continued for trial. The contested dispositional hearing was ultimately held over the course of several days in January 2015. The social worker testified that she had to remove Gianna from her foster home due to mother's threat of removal. Gianna was moved to the Valley of the Moon Children's Home and then ultimately placed with her maternal great-aunt.

With respect to residential substance abuse treatment, mother was reportedly in contact with Friendship House at the beginning of the case, but told the social worker that Friendship House would not accept her due to her medical needs. The social worker testified that she recommended A Step Up residential treatment program for dual-diagnosed clients—that is, clients with both mental health and substance abuse issues. However, mother ultimately reapplied and was admitted to Friendship House and chose to go there instead. Mother entered Friendship House on October 16, 2014. Thereafter, on November 10, 2014, mother's counselor reported to the social worker that mother had been put on a "talking ban" because she was "struggling with 'impulsivity,' " conflicts with peers, and some self-harm behavior, specifically banging her head against the wall. On November 21, 2014, mother was asked to leave Friendship House after she gave her

_____

[4] Later, mother testified as follows regarding her behavior: "I thought if I gave a dirty test, I would lose my daughter. So I decided to act kind of crazy, and it backfired and bit me in the butt."

12

prescription medication to another resident. She was able to enter another residential treatment program, Center Point, on November 24, and remained there at the time of the dispositional hearing.

The ICWA Representative then testified, opining that culturally relevant preventative services had not been provided to mother. She also stated that she believed providing mother with reunification services would be in Gianna's best interests. In response, the social worker testified exhaustively regarding the efforts that had been made for mother in coordination with the Tribe since the commencement of the case. In addition, according to the social worker, mother had again been court-ordered to participate in treatment by the criminal court on January 16, 2015. However, this did not change her opinion that bypass of services was appropriate in this case because mother had been "[c]ourt-ordered to that in the past and, unfortunately, it's been unsuccessful." Finally, mother testified regarding her progress in residential treatment and her desire to reunify with Gianna. She admitted that she was a drug addict with a long history of drug use "off and on."

At the conclusion of the January 2015 contested disposition hearing, the judge declared Gianna to be a juvenile court dependent, removed her from the physical custody of both parents, and ordered reunification services for father. With respect to mother, the juvenile court first concluded that mother was described by subdivision (b)(13) and therefore qualified for bypass of reunification services. With respect to Gianna's best interests, the court opined: "[L]ooking at what is in Gianna's best interests, I used the term before, that her life has been a pingpong ball in a tornado, and she needs the wind to die down. I just—I can't go any other route for her." Thus, mother was also denied reunification services under section 361.5, subdivision (c), because they were not in the best interests of the child. Thereafter, mother's timely notice of appeal brought the matter before this court.

13

## II. DISCUSSION

### A.    *Reunification Bypass Under Subdivision (b)(13)*

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father." (§ 361.5, subd. (a).)  The purpose of reunification efforts is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child.  This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 (*Baby Boy H.*).)  However, it is also the "intent of the Legislature, especially with regard to young children, . . . that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.)  Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (See *Ibid.*)  Specifically, section 361.5, subdivision (b), exempts from reunification services "those parents who are unlikely to benefit" from such services or for whom reunification efforts are likely to be "fruitless." (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 474; *Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 478.)  Under such circumstances, a child's need for stability and permanence outweighs a parent's interest in reunification.

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821 (*Melissa R.*).)  In the present case, the juvenile court denied reunification services to mother based on one such bypass provision, subdivision (b)(13), which provides, in relevant part, that reunification services shall generally not be ordered for a parent if the court finds by clear and convincing evidence that the parent "has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention." (§ 361.5, subds. (b)(13) & (c).)

14

In 2002, the Legislature amended subdivision (b)(13) to clarify that the prior treatment required under the statute was prior *court-ordered* treatment rather than voluntary treatment. (See *D.B. v. Superior Court* (2009) 171 Cal.App.4th 197, 205 (*D.B.*).) However, for purposes of the bypass provision, "prior court-ordered treatment" includes treatment ordered as a condition of parole or probation. (See *Id.* at p. 204; *In re Brian M.* (2000) 82 Cal.App.4th 1398, 1402-1403 (*Brian M.*).) Moreover, the prior substance abuse treatment need not have occurred within the three-year period immediately prior to the filing of the dependency petition at issue. (*Laura B. v. Superior Court* (1998) 68 Cal.App.4th 776, 779-780 (*Laura B.*).) Rather, what is required during the relevant three-year timeframe is some type of *resistance* to prior court-ordered treatment. "Such proof may come in the form of dropping out of programs, but it may also come in the form of resumption of regular drug use after a period of sobriety." (*Id.* at p. 780.) Thus, successful completion of the prior treatment program is not relevant, where the evidence shows a return to substance abuse. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 73 (*Randi R.*); see also *Laura B.*, *supra*, 68 Cal.App.4th at p. 780 ["demonstration of a determination to maintain a drug habit" sufficient to establish resistance to prior treatment].)

We review an order denying reunification services under subdivision (b) of section 361.5 for substantial evidence. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) Under such circumstances, we do not make credibility determinations or reweigh the evidence. (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242.) Rather, we "review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings," keeping in mind "the heightened burden of proof." (*Ibid.*; *In re A.E.* (2014) 228 Cal.App.4th 820, 826.) Of course, to the extent our analysis involves statutory interpretation, this is a legal matter which is subject to our de novo review. (*Robles v. Employment Development Dept.* (2015) 236 Cal.App.4th 530, 546.)

In the present case, the record seems to strongly support the juvenile court's conclusion that bypass of reunification services for mother was warranted pursuant to

15

subdivision (b)(13). First, it is hard to argue that mother's relationship with drugs and alcohol is anything other than "extensive, abusive, and chronic." (§ 361.5, subd. (b)(13).) Both parents—who had been living together since approximately 2005—admitted to the Department in 2011 that they used drugs throughout their relationship, other than the period when mother was pregnant and breastfeeding Gianna. And mother continued to test positive for drugs and/or present as under the influence from the Department's first intervention in June 2011 until she finally entered residential treatment in October 2014. Thus—other than the period when she was pregnant and breastfeeding Gianna in and around 2009—mother had been abusing drugs and alcohol for at least nine years in a manner that clearly impacted her ability to maintain a safe and stable lifestyle.

Second, mother indisputably engaged in prior court-ordered substance abuse treatment when she participated in, and indeed successfully completed, a deferred judgment drug court program in 2009 in connection with her December 2008 drug-related arrest. Finally, it is hard to argue that mother's behaviors between 2011 and the filing of the instant dependency petition in 2014 amount to anything other than a "demonstration of a determination to maintain a drug habit" sufficient to establish resistance to prior treatment. (See *Laura B.*, *supra*, 68 Cal.App.4th at p. 780.) Indeed, mother, herself, admits that during this three-year timeframe she had a serious substance abuse problem. Since mother received prior treatment for her substance abuse, and then resisted rehabilitation during the three-year period prior to the filing of Gianna's dependency petition, the juvenile court's decision to deny her reunification services under subdivision (b)(13) was supported by substantial evidence. (Cf. *Brian M.*, *supra*, 82 Cal.App.4th at p. 1403.)

In an attempt to avoid this fairly obvious result, however, mother advances for the first time on appeal a novel argument based on the language of subdivision (b)(13), itself. Specifically, she asserts at length that the prior substance abuse treatment justifying bypass under subdivision (b)(13) must not only be court-ordered, but must also be treatment for the "extensive, abusive, and chronic use of drugs or alcohol." In mother's view, since the statute first requires a "history of extensive, abusive, and chronic use of

drugs or alcohol" and then states that the parent must resist "prior court-ordered treatment *for this problem*," the prior treatment must expressly be for "extensive, abusive, and chronic" substance abuse. (§ 361.5, subd. (b)(13), italics added.) Mother then posits that there are different levels of substance abuse treatment and contends that, in her case, the court-ordered drug treatment she completed in 2008 was merely "a standard deferred-judgment drug-court program of counseling and testing ordered for a first time drug-related offense." Moreover, she claims that there is no evidence that she even had a problem of extensive or chronic substance abuse at the time she was ordered to do the program in 2008. Under these circumstances, mother concludes that her drug-addicted behaviors from 2011 through 2014 cannot be viewed as resistance to prior court-ordered treatment *for a chronic problem of substance abuse*, and thus bypass under subdivision (b)(13) was inappropriate. We are not convinced.

Preliminarily, we disagree with mother's characterization of the facts. Mother admitted that she and father had been using drugs together since at least 2005 when their relationship began. Thus, when mother was arrested on drug-related charges in December 2008, she had been using drugs continuously for over three years. Moreover, the fact that mother came to the attention of the criminal justice system in 2008 due to her drug use attests to the fact that her problem was, at that point, significant and abusive enough to interfere with her ability to live a safe and stable life. Thus, the record does support the conclusion that mother was struggling with serious and long-term addiction issues as early as 2008. Nor are we convinced that mother's drug court treatment program for a "first time drug-related offense" was necessarily ineffective to treat serious substance abuse. Indeed, the only time that mother was able to maintain a significant period of sobriety between 2005 and 2014 was while she was participating in that program. Under these circumstances, even if we were to embrace the interpretation of subdivision (b)(13) championed by mother—requiring proof that the treatment program which mother subsequently resisted was for serious substance abuse and demanding evidence that mother was a chronic substance abuser at the time she was ordered to

17

complete that treatment program—substantial evidence supports the juvenile court's bypass decision.

More importantly, however, even if the facts were insufficient to support bypass under mother's interpretation of the statute, we are aware of no precedent adding the additional hurdles mother suggests to the existing requirements of subdivision (b)(13), and we decline to do so here. (See, e.g. *In re William B.* (2008) 163 Cal.App.4th 1220, 1229-1230 (*William B.*); *Brian M.*, *supra*, 82 Cal.App.4th at pp. 1401-1403 & fn. 3; *Laura B.*, *supra*, 68 Cal.App.4th at pp. 779-780; *Randi R.*, *supra*, 64 Cal.App.4th at pp. 72-73.) It is axiomatic that "[i]n construing a statute we must ascertain the legislative intent, so as to effectuate the purpose of the law." (*Melissa R., supra,* 207 Cal.App.4th at p. 822.) We believe the best reading of subdivision (b)(13) is that it requires a parent with a chronic substance abuse problem to have resisted prior court-ordered substance abuse treatment. Nothing in the statute demands a particular type of substance abuse treatment or a specific level of addiction at the time that treatment is provided. Nevertheless, mother's interpretation is also arguably supportable by the statutory language, and therefore the statute is ambiguous on this point. When a statute is ambiguous, we consider "the purpose of the statute, legislative history, and public policy" and then " 'choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences.' " (*D.B.*, *supra*, 171 Cal.App.4th at p. 203.)

With respect to the legislative purpose underlying subdivision (b)(13), the statute " 'reflect[s] a legislative determination that an attempt to facilitate reunification between a parent and child generally is not in the minor's best interests when the parent is shown to be a chronic abuser of drugs who has resisted prior treatment for drug abuse.' " (*William B.*, *supra*, 163 Cal.App.4th at p. 1228.) This is because "[e]xperience tells us that such a parent has a high risk of reabuse." (*Ibid.*) The statute thus allows the court "to identify parents who, due to their history of substance abuse and resistance to treatment in the face of penal or other legal sanctions, are unlikely to benefit from

18

reunification services." (*D.B.*, *supra*, 171 Cal.App.4th at p. 204.) Presumably, court-ordered treatment under threat of reincarceration or loss of a child is uniquely situated to "inspire an abuser of drugs or alcohol to reform." (See *id.* at p. 205, fn.5.) If a parent is ordered to complete such a treatment program and nevertheless returns to a life of substance abuse, it "suggests that a person is less likely to move toward sobriety in a timely way and reunify with his or her child" if again court-ordered into treatment. (See *ibid.*) As currently interpreted, then, subdivision (b)(13) admirably fulfills its underlying purpose, and we see no need to further condition its use. Indeed, to do so might restrict the statute's reach such that dependent minors' best interests are not served, and services are offered in situations where reunification efforts are likely to be fruitless. Importantly, the court may always order reunification services in a particular case if it finds, under the specific circumstances before it, that reunification is in the best interests of the child. (§ 361.5, subd. (c).)

Finally, we note that, as stated above, the Legislature amended subdivision (b)(13) in 2002 to clarify that the prior treatment at issue must be court-ordered rather than voluntary. (See *D.B.*, *supra*, 171 Cal.App.4th at p. 205.) Although a number of cases prior to 2002 addressed the requirements of subdivision (b)(13) without requiring proof that the prior treatment be expressly for "extensive, abusive, and chronic" substance abuse, the Legislature did not repudiate these holdings in its 2002 amendment, or otherwise alter the statutory language to make clear that such an additional finding was necessary. (See, e.g. *Brian M.*, *supra*, 82 Cal.App.4th at pp. 1401-1403 & fn. 3; *Laura B.*, *supra*, 68 Cal.App.4th at pp. 779-780; *Randi R.*, *supra*, 64 Cal.App.4th at pp. 72-73.) "When the Legislature reenacts a statute that has been judicially construed, there is a strong presumption that it adopts the construction placed on the statute by the courts. [Citation.] In such circumstances, the Legislature is presumed to have known of and acquiesced in the prior judicial construction." (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1439.) Thus, this presumption further supports our rejection of mother's inventive interpretation of subdivision (b)(13).

19

In sum, the juvenile court did not err in finding that mother was a parent described by subdivision (b)(13) of section 361.5.

**B.    *Reunification Efforts Under Section 361.5, Subdivision (c)***

Pursuant to section 361.5, once the juvenile court determines that a parent is described by subdivision (b)(13) of that statute, it shall not order reunification services for the parent "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c).)  Moreover, in such a situation, it is the parent's burden to prove that the minor would benefit from the provision of court-ordered services.  (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 (*Gabriel K.*).)  At the January 2015 disposition hearing in this case, the juvenile court expressly found that offering reunification services to mother would not be in Gianna's best interests.

In particular, the court stated:  "I want mom to succeed.  But she has so much to overcome, a history of failure, mental-health issues, a family history, a life history that's just almost crippling."  Given these factors, the court could not conclude that reunification efforts would likely be successful.  Rather, it could find nothing other than "the substantial risk that Mother's history is going to be repeating itself."  Further, when speaking directly of Gianna's best interests, the court exclaimed:  "[H]er life has been a pingpong ball in a tornado, and she needs the wind to die down.  I just—I can't go any other route for her."  It thus declined to find reunification efforts for mother to be in Gianna's best interests.  We review a juvenile court's best interests determination in this context for abuse of discretion.  (*William B.*, *supra*, 163 Cal.App.4th at p. 1229 ["[a] juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child  under section 361.5, subdivision (c)"] .)

" 'The concept of a child's best interest "is an elusive guideline that belies rigid definition.  Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." ' "  (*William B.*, *supra*, 163 Cal.App.4th at p. 1227.)  Nevertheless, precedent supplies certain relevant considerations when making a best interests determination.  For instance, "[t]o determine whether reunification is in the child's best

interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity." (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116; see also *William B.*, *supra*, 163 Cal.App.4th at p. 1228.) Further, with respect to stability and continuity, "[s]ubdivision (b)(13) of section 361.5 'reflect[s] a legislative determination that an attempt to facilitate reunification between a parent and child generally is not in the minor's best interests when the parent is shown to be a chronic abuser of drugs who has resisted prior treatment for drug abuse.' " (*William B.*, *supra*, 163 Cal.App.4th at p. 1228.) This is because "[e]xperience tells us that such a parent has a high risk of reabuse." (*Ibid.*) Thus, under such circumstances, "at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them." (*Id.* at pp. 1228-1229; see also *In re Jesse W.* (2007) 157 Cal.App.4th 49, 66 (*Jesse W.*) [noting that a court in exercising its discretion on the issue of best interests of the child has the "ability to evaluate whether the parent will utilize . . . services and whether those services would ultimately inure to the benefit of the minor"].)

In the present case, mother agrees that a parent's likelihood of success if reunification services were offered is relevant to a best interests calculation. In support of her position that services should have been provided to her, mother argues that considerable evidence exists that she was strongly motivated to reunify and was making progress in residential treatment. She also offers the ICWA Representative's opinion that mother was receptive to services and likely to benefit from them. In highlighting this evidence, however, mother ignores the significant contrary evidence in the record, in particular the juvenile court's express findings that mother's current efforts were simply " 'too little, too late,' " given her history and that she was at "substantial risk" of repeating that history. In fact, until her three months in residential treatment immediately prior to the January 2015 dispositional hearing, mother, as detailed above, had resisted

drug treatment for years—continuing to abuse drugs; accumulate drug-related criminal charges; and live a volatile, mentally unstable, and destructive lifestyle. In the social worker's opinion, providing reunification services to mother would likely not be successful and would thus be contrary to Gianna's need for stability. Under such circumstances, the court could properly find that mother was unlikely to successfully utilize reunification services, and thus those services would not ultimately inure to Gianna's benefit. (See *Jesse W.*, *supra*, 157 Cal.App.4th at p. 66.)

Moreover, we disagree with mother's characterization of the bypass finding in this case as "marginal," another factor she argues supports the provision of reunification services to her pursuant to section 361.5, subdivision (c). To the contrary, as discussed above, we believe the evidence here strongly supports the juvenile court's decision to deny reunification services for mother based on her significant history of chronic substance abuse. And, even if mother's claim had merit, it has no bearing on a best interests determination, where, as here, the court has otherwise found that mother would be unlikely to successfully reunify.

Mother also argues that reunification services were in Gianna's best interests because she had a positive bond with her mother. In support of this contention, mother notes that she raised Gianna for the first five years of her life, that her neglect of Gianna only related to her "periodic" use of drugs, that prior Department interventions did not result in removal, and that the ICWA Representative testified that mother should be granted services for Gianna's sake. However, while we have no doubt that mother loves Gianna and that Gianna knows her mother—having lived with her for almost five years— there is significant evidence in the record that Gianna's bond with her mother is not a positive one.[5]

For instance, the social worker, although describing Gianna as "charming" and "sweet," reported that the minor verbalized darker thoughts and ideation than were

---

[5] Furthermore, contrary to mother's contentions, this evidence does not relate solely to the harm caused to Gianna by mother's mental collapse in the wake of Gianna's removal from her care.

typical for a child of her age. On her first night in foster care, when allowed to lead the prayer at dinner, Gianna commenced a prayer about killing a goat. She had also exhibited ominous play, involving things such as " 'ripping half your face off and it bleeding,' cutting arms off, and playing 'bloody fingers.' " The Department was additionally concerned with how easily Gianna found comfort with strangers, something the social worker posited might be related to her need to seek safety. Gianna began calling her foster parents mom and dad on the first night she was placed with them, and told her foster father she loved him a few days later. She tried to hug and kiss her teacher when they met on the first day of school. Further, two weeks after Gianna's detention, mother reported that Gianna called the social worker her best friend. At that point, the social worker had only had one contact with the minor, at the time of her removal. Finally, mother's behaviors in absconding with Gianna to avoid her detention; in "stalking" Gianna's foster family after the minor's detention; and in telling Gianna to keep secret mother's plan to have a man take her from her foster home were all significantly destabilizing for the minor. For instance, mother's behaviors caused Gianna to be removed from her initial foster home where she was happy and doing well and also delayed necessary therapy for the minor because arrangements had to be made for services through her new placement.

Moreover—and in direct contravention of mother's claim that the neglect suffered by Gianna was somehow not significant because it did not previously result in her removal and was based solely on mother's "periodic" use of drugs—the record reveals substantial evidence that mother's issues were pervasive within the family and had a tremendously destabilizing effect on Gianna. In fact, "the consistent report from adult family, service providers, and collaterals, is that their experiences of [mother were] frequently ones of chaos and frenzy, with the mother presenting with extreme behavioral, emotional, and mental variances." In the opinion of the social worker, "[i]t would be difficult for a child to grow up in such a home with this amount of volatility and be able to develop the ability to self regulate their own emotions and mental health." In fact, she observed Gianna to be overwhelmed by her mother's anxiety and "frantic" demeanor.

23

During mother's emotional outbursts, Gianna would stand wide-eyed and silent. On one occasion, when she experienced her mother "crying, screaming, and swearing," Gianna "quickly pulled the hoodie on her shirt over her head and ran away." Moreover, the minor appeared to take mother's anxieties on as her own. When speaking to the social worker about her "worries" during a visit, "Gianna spontaneously dropped her head, placed her hands over her eyes and slowly pulled her hair down in front of her face, covering it." The social worker described this behavior as "unnerving" because it was "eerily similar" to mother's behavior when stressed. On another occasion, Gianna verbalized that she was worried her mother would jump from a roof and "get dead." Mother's assertions to the contrary, this is not the picture of a positive and nurturing mother-daughter bond.

Finally, mother argues that she should have been offered reunification services in Gianna's case because, since father was provided with services, denying mother services would not hasten permanency and was thus of no "appreciable benefit" to Gianna. We disagree. Certainly, the fact that another parent is being offered reunification services is relevant to the juvenile court's analysis of a minor's best interests under subdivision (c) of section 361.5. (See *In re G.L.* (2014) 222 Cal.App.4th 1153, 1163, 1165.) However, it is not dispositive. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 109 (*Lana S.*).) In *Lana S.*, for instance, the appellate court upheld a denial of reunification services to a mother, despite the provision of services to the father, where the mother had a chronic substance abuse problem, had previously resisted treatment, and was unlikely to successfully participate in court-ordered services. (*Lana S.*, *supra*, 207 Cal.App.4th at pp. 98-99, 108-109.) Similarly, here, the juvenile court concluded that the provision of reunification services to mother would likely prove fruitless given her history, and thus appropriately focused reunification efforts on father as the parent most likely to reunify. (See *Gabriel K.*, *supra*, 203 Cal.App.4th at p. 196.) Moreover, as the juvenile court recognized, significant evidence in the record supports the conclusion that Gianna was harmed by exposure to mother's volatile and dangerous behaviors and thus required protection from that instability, regardless of the provision of services to father.

24

Under these circumstances, we see no error in the juvenile court's decision to deny reunification services to mother under section 361.5, subdivision (c), and certainly no abuse of discretion.

## C.  *Active Efforts Under the ICWA*

Under the ICWA, before an Indian child may be removed from parental custody, a child welfare agency must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d); see also § 361, subd. (d); 361.7, subd. (a); Cal. Rules of Court, rule 5.484(c).)  With respect to "active efforts," California law provides:  "What constitutes active efforts shall be assessed on a case-by-case basis.  The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe.  Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers."  (§ 361.7, subd. (b).)  Given California's " 'heightened view' " of what constitutes reasonable services under state law, there is, generally speaking, "no significant difference" between the active efforts required by the ICWA and the reasonable services required pursuant to the dependency statutes.  (*C.F. v. Superior Court* (2014) 230 Cal.App.4th 227, 238 & fn. 7 (*C.F.*); see also *In re Michael G.* (1998) 63 Cal.App.4th 700, 714 [other than requiring culturally sensitive services, "the standards in assessing whether 'active efforts' were made to prevent the breakup of the Indian family, and whether reasonable services under state law were provided, are essentially undifferentiable"].)

Recognizing the similarities between an active efforts analysis and a reasonable services determination, this Division reviews a juvenile court's finding with respect to active efforts for substantial evidence.  (*C.F.*, *supra*, 230 Cal.App.4th at pp. 238-239.)  Thus, we must review the record in the light most favorable to the judgment.  (*Id.* at p. 239.)  Moreover, we will uphold the juvenile court's active efforts finding "unless it

25

can be said that no rational factfinder could reach the same conclusion." (*Ibid.*, internal quotation marks omitted.)

Despite this daunting standard of review, mother argues that the juvenile court erred in finding that sufficient active efforts were made in this case. Specifically, she contends there is *no evidence* that the Department provided her with any pre-detention or pre-dispositional services designed to avoid the dispositional removal of Gianna—that is, to avoid the breakup of the Indian family. According to mother, the Department essentially provided no services to her because it intended to request bypass of reunification services. As our extensive recitation of the facts above makes clear, however, this is patently untrue.

In connection with its first substantiated neglect referral in June 2011, the Department met with the parents with respect to their substance abuse issues, coordinated with a representative of Tribal TANF regarding continuing drug testing and support services for the family, referred the parents to therapy and parenting classes, and determined that mother was attending NA meetings and a women's recovery group through Tribal Health. It closed the referral only with the assurance that Tribal TANF would continue to monitor the family. In December 2012, the Department again contacted mother when it learned that she was not following through with a recommendation for residential treatment. After the social worker emphasized the need for mother to engage in treatment in order to safely care for Gianna, mother agreed to outpatient services through Turning Point, and a treatment plan was developed for her which included substance abuse treatment, pain management, mental health management, and parenting classes. The Department again closed the referral, but warned mother that if she did not engage in services the Department "would be forced to take a more aggressive role with the family."

Then, when the Department received the most recent referral in connection with mother's May 2014 arrest, the Department immediately contacted the ICWA Representative and worked with her extensively throughout the pre-dispositional period to arrange appropriate substance abuse and mental health treatment for mother. The

social worker's testimony in this regard was extensive and we will not recount all of it here.[6]  Suffice to say that it reflects coordination with, or participation by, the ICWA Representative with respect to the initial home visit for the family; the availability of tribal placements for Gianna; both TDMs held for the family at which services were discussed; the referral of mother to SCIHP for mental health evaluation; the selection of an appropriate provider for mother's psychological evaluation; the status of the minor; and repeated discussions regarding appropriate substance abuse treatment options for mother.  And, while it is true that the ICWA Representative, herself, also worked with mother to support her and to engage her in services—particularly with respect to culturally appropriate residential treatment—"such collaboration is precisely what is called for.  Section 361.7 provides that '[a]ctive efforts shall utilize the available resources of the Indian child's . . . tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers.' "  (*C.F.*, *supra*, 230 Cal.App.4th at p. 241.)  Thus, taken as a whole, the record contains more than substantial evidence that, from the initial referral in June 2011 through the January 2015 dispositional hearing, active efforts were appropriately provided in an attempt to keep Gianna and mother together.

Moreover, given the scope of the active efforts made in this case, we do not find persuasive mother's additional argument that denying reunification services to her at disposition pursuant to section 361.5, subdivision (b)(13), was, in itself, a violation of the ICWA's "active efforts" requirement.  As we recently articulated in *C.F.*, the active

---

[6] Interestingly, at trial the ICWA Representative seemed to have very little recollection of the numerous contacts made by the social worker in this case to discuss both substance abuse and mental health treatment for mother.  Indeed, she testified that she did not speak with the social worker about case planning, reunification services, or services that would otherwise prevent removal of the minor from mother.  However, the trial court clearly discounted this testimony in favor of the social worker's meticulous recitation of the many joint efforts made, stating:  "I know the parties have different perspectives on the efforts of the Department to provide culturally appropriate services, but I find that [the social worker's] testimony—and I will use this term, hopefully not in the aggressive manner, but her testimony that went on, *ad nauseum*, about all the things she has done, meets the standard that this Court must look at."

27

efforts mandate requires only that culturally sensitive, " ' "timely and affirmative steps be taken to accomplish the goal which Congress has set:  to avoid the breakup of Indian families *wherever possible* by providing services designed to remedy problems which might lead to severance of the parent-child relationship." ' " (*C.F.*, *supra*, 230 Cal.App.4th at pp. 239-240, italics added.)  Thus, the ICWA does not require the provision of reunification services to every parent.  (See *Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1015-1018 (*Letitia V.*); see also *K.B. v. Superior Court* (2009) 173 Cal.App.4th 1275, 1283-1285 (*K.B.*).)

For instance, in *Letitia V.*,  the court held that the ICWA does not require a juvenile court to offer reunification services to a parent who previously received active efforts to overcome a history of substance abuse in a sibling dependency proceeding, but failed to reunify.  (*Letitia V.*, *supra*, 81 Cal.App.4th at pp. 1015-1018.)  Noting that the law does not require the performance of idle acts, the court concluded that there was no reason to duplicate services in a second case "where substantial but unsuccessful efforts have just been made to address a parent's thoroughly entrenched drug problem" in a sibling dependency proceeding.  (*Id.* at p. 1016.)  Thus, bypass of reunification services in the second case was not violative of the ICWA, because the court relied on the active efforts made in the first case to support its finding that active efforts had been made in the subsequent dependency.  (*Id.* at pp. 1017-1018.)

More recently, in *K.B.*, the court read the *Letitia V.* decision as holding that, under the ICWA, "where the parent's history indicates the futility of offering services, no further services must be offered." (*K.B.*, *supra*, 173 Cal.App.4th  at p. 1284.)  On this basis, the *K.B.* court concluded that *no* active efforts—either pre- or post-disposition— were required for a father who was a registered sex offender with a prior child molestation conviction, where allegations were sustained in the juvenile court that he subsequently molested a half-sibling of his children in the family home.  (*Id.* at pp. 1284, 1287-1288.)  Because father's "history clearly demonstrate[d] the futility of offering reunification services," the court determined that requiring the juvenile court "to provide services to the father would be at best an idle act which would not further the legislative

28

purposes of ICWA." (*Id.* at p. 1284; see also *id.* at pp. 1287-1288 [bypass of reunification for father appropriate under the ICWA where "[t]here were no services which could be offered to him which would have prevented the breakup of the family"].)

Here, as described above and in contrast to both *Letitia V.* and *K.B.*, mother was provided with substantial active efforts specifically related to Gianna in an attempt to prevent the breakup of her Indian family prior to disposition in this case. Unfortunately, both the Department and the juvenile court concluded at that point, based on mother's extreme history of substance abuse and mental health issues, that successful reunification was not likely. Specifically, the social worker testified that she did not believe that mother was "able to maintain enough stability to be able to reunify . . . successfully." And the juvenile court expressly found that there was nothing "other than the substantial risk that Mother's history is going to be repeating itself." Although certainly a tragic result, given the perceived futility in making any further reunification attempts with respect to mother, the juvenile court's dispositional order removing Gianna from her parents and bypassing mother for reunification was not violative of the ICWA.

## III. DISPOSITION

The judgment is affirmed.

29

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.